JUSTINA MIKKANEN *vs.* SAFETY FUND NATIONAL BANK.

Worcester.   October 5, 1915. — October 16, 1915.

Present: RUGG, C. J., LORING, DE COURCY, PIERCE, & CARROLL, JJ.

*Negligence,* Of person controlling real estate.   *Elevator.*

In an action against the owner of a building in control of its common hallways and stairways for personal injuries from being struck by the gate of the well of a freight elevator, that was used for the transportation of the customers of tenants in the building, which fell on the plaintiff after it had been raised to allow the plaintiff to alight at the second floor, there was evidence that the gate, when thrown up by the boy operating the elevator, who was in the employ of a tenant in the building, should have stayed up, that the gates opening into the elevator, including this gate, did not work properly and at times fell down when they should have stayed up and would have done so if the mechanism had worked properly, and that the fact that the gates did not work properly had been reported to the janitor, that the plaintiff had been invited to enter the elevator by the boy in the employ of a tenant whose customer she was, and that for nineteen years that tenant's customers when they wished to see articles on floors above the first floor had been taken up in this freight elevator which brought them on each floor to a common hallway. *Held,* that there was evidence of negligence on the part of the defendant in failing to repair the gate of the elevator well after notice of its defective condition and also evidence that the defendant knew of the use of the freight elevator for the transportation of customers of the tenant.

In the same case the defendant contended that it was a matter of conjecture whether the gate fell because the catch was out of repair or fell because it was not thrown up high enough by the tenant's boy operating the elevator. On this point the plaintiff testified that the boy "threw up with his hands the gate across the entrance and opened into the hall the doors [in the hallway] that were next to the gate. When the gate was thrown up, and the doors opened, she started to step out and when one foot was in the hallway and the other was in the elevator the gate came down and hit her." The doors in the hallway were fire doors that had to be unlocked and then swung back. *Held,* that this evidence warranted a finding that the gate did not come down immediately, as it would have done if it had not been thrown up high enough by the boy, and therefore that the gate must have come down because the catch did not work as it should have worked.

TORT for personal injuries sustained by the plaintiff on May 9, 1914, from being struck by the gate of an elevator well falling upon her when she was stepping out of the elevator at the second floor of the defendant's building on Main Street in Fitchburg. Writ dated June 25, 1914.

In the Superior Court the case was tried before *Hall,* J. At the close of the plaintiff's evidence, the report of which to this court is described in the opinion, the defendant rested, and asked the judge to rule that on all the evidence and the pleadings the plaintiff could not recover. The judge so ruled and ordered a verdict for the defendant. He then reported the case for determination by this court with a stipulation of the parties that, if the ordering of the verdict for the defendant was right, judgment should be entered for the defendant; and that, if the order of the judge was wrong, judgment should be entered for the plaintiff in the sum of $275.

The case was submitted on briefs.

*J. G. Annala,* for the plaintiff.

*T. H. Gage, F. F. Dresser & D. W. Lincoln,* for the defendant.

LORING, J. The difficulty in this case arises from the two facts that the plaintiff's evidence (on which the defendant rested) was meagre and that the statement of it in the report is in some respects obscure.

The plaintiff went to Austin's furniture store to buy a clothes basket. She asked for a clerk who could speak Finnish and was told to go to the second floor. Accordingly she went into the hallway and began to go up the stairway when she was beckoned into a freight elevator by Austin's boy who was operating it. Thereupon, to quote the words of the report, "He took her to the second

floor, threw up with his hands the gate across the entrance and opened into the hall the doors that were next to the gate. When the gate was thrown up, and the doors opened, she started to step out and when one foot was in the hallway and the other was in the elevator the gate came down and hit her. . . . The boy threw up the gate with both hands." In addition to testifying herself the plaintiff called no witnesses except Austin, the proprietor of the furniture store, and Kennedy, one of his clerks.

It appeared that Austin was the tenant of one end of the bank building owned by the defendant bank and that he used it for a furniture store. Austin occupied the basement, the street floor and the three stories above the street floor. The street floor of the other end of the building was occupied by the defendant for carrying on its banking business and that of the centre of the building by one Smiley as a dry goods store. The upper stories of the building except those occupied by Austin were fitted up for offices and let to tenants. The main entrance of the building was between the bank and Smiley's store. At this entrance of the building there was a passenger elevator. There was a second entrance to the building between Smiley's and Austin's stores; at the rear of the entry at this entrance was the freight elevator here in question, and on one side of this entry was a stairway. As we understand the report this freight elevator opened on the public entry way at each of the four floors, and on the entry way only, and it was shut off from the entry way at each story by a galvanized iron fire door which was kept locked. These doors swung back, and after they were swung back they closed automatically by reason of a heavy spring on them. The janitor of the building employed by the defendant bank had one key to these fire doors, Smiley had another key, and Austin testified that he and his clerks had five keys to them.

Austin testified that he "had occupied the store since 1895 and occupied it in May, 1914," the date of the accident to the plaintiff. Beyond this bare statement there is nothing in the bill of exceptions as to the terms of the lease or agreement under which Austin had "occupied the store since 1895," that is to say, for a period of nineteen years before the accident here in question. Austin testified that "the gates were installed at that elevator" by order of the State inspector some "five or six years ago," that is to

say, some thirteen or fourteen years after he first became a tenant of the furniture store. In answer to the question whether it had been his habit when the public came to the store "to take them up on the higher floors in the [freight] elevator," Austin testified: "Yes; anything above the first floor we always take the elevator. I have been doing that ever since I have been in the place there. . . . I have furniture on all five floors. " He also testified that Smiley used the freight elevator for moving goods from the basement to his store which was on the street floor; and beyond that: "The occupants on the higher floors do not use the elevator personally without the janitor."

It appeared from the bill of exceptions that the gates to the freight elevator were supposed to engage a catch when thrown up, and this catch was released when the elevator went six inches up or down. In addition both he and his clerk testified that the gates at times fell down when they were thrown up and should have stayed up if the mechanism had worked properly. Austin testified that this applied to the gate at the floor here in question, and that the fact that the gates did not work properly had been reported to the janitor. His clerk testified that when the gates did not catch when thrown up they came down "immediately."

1. It is plain that on these facts the freight elevator here in question comes within the rule as to common hallways and stairways which are left in control of the landlord and with respect to which the landlord is liable if he does not exercise reasonable care to keep them in good condition, or more accurately, in the same safe condition in which they were at the beginning of the term; as to which see *Flanagan* v. *Welch*, 220 Mass. 186, where the cases are collected.

2. There was evidence of negligence on the part of the defendant in not keeping the gate to the freight elevator here in question in proper repair. It often had fallen when it ought not to have fallen, and of this complaint had been made to the defendant's janitor.

3. The defendant has contended that the gates were in the same condition in which they were when they were first put in by direction of the State inspector five or six years before the accident to the plaintiff and there was evidence to that effect. Whether the jury were bound to find in accordance with that evidence need not be considered because in any event it does not affect the

liability of the defendant. So far as appears Austin's tenancy began thirteen or fourteen years before the gates were put in. The rule, therefore, that a landlord is liable only to use due diligence to keep common stairways, hallways and similar parts of his building in the same repair in which they were at the beginning of the lease has no application to this case.

4. The next question is whether the plaintiff is within the class of persons who, as respects the defendant, could be invited by Austin to use the freight elevator. In the case at bar, as in *Fitzsimmons* v. *Hale*, 220 Mass. 461, that depends upon the use made of the elevator with the knowledge of the defendant. If the defendant knew of the use of the elevator testified to by Austin the plaintiff was within that class. The question therefore comes to this: Were the jury warranted in finding that the defendant knew of the use of the freight elevator which on Austin's testimony had been made by him for nineteen years?

If the five keys to the fire doors which Austin had to enable his clerks to operate the elevator were furnished by the defendant there is no doubt as to the answer to that question. It would seem to be a fair inference from all the facts that they were furnished by it. But that is not entirely clear and we lay that on one side. Laying that on one side, the case could be found by the jury to be a case where for nineteen years all Austin's customers who wished to see furniture on any one of the three upper floors of his store were taken to those floors by this freight elevator, which was used in common by the landlord, by Austin and (so far as one story was concerned) by Smiley, which remained in the control of the landlord and was kept in repair by its janitor. If the jury found that for nineteen years all of Austin's customers who wished to see furniture on any one of the three upper floors went up in this common freight elevator, and in doing so passed through the common hall and entry way when entering and leaving the elevator, they were warranted in making the further finding that this nineteen years' use was known to the defendant landlord.

5. The defendant's last contention is that it is a matter of conjecture whether the gate fell because the catch was out of repair or because it was not thrown up high enough by Austin's boy, who was operating the elevator. But the testimony of the plaintiff

was: That the boy "threw up with his hands the gate across the entrance and opened into the hall the doors that were next to the gate. When the gate was thrown up, and the doors opened, she started to step out and when one foot was in the hallway and the other was in the elevator the gate came down and hit her." That is to say, when the freight elevator came to the second floor where the plaintiff wished to go to find the clerk who spoke Finnish, the elevator boy had to do three things: (First) he had to stop the car; (second) he had to throw up the gate; and (third) he had to unlock the fire door into the entry and swing it back. The plaintiff's testimony is that the boy first threw up the gate, then unlocked the door, and that then she started to step out; and that "when one foot was in the hallway and the other was in the elevator the gate came down and hit her." This testimony warranted a finding that the gate did not come down "immediately" when it was thrown up, as it would have done if it had not been thrown up high enough by the boy operating the elevator. In other words there was evidence that the gate came down because the catch did not work as it should have worked.

6. It follows that the plaintiff was entitled to go to the jury and that under the stipulation of the parties judgment is to be entered for the plaintiff in the sum of $275. It is

*So ordered.*