WALTER S. BEATTY & another *vs.* PHILIP R. AMMIDON & another.

Suffolk.   March 8, 1927. — July 11, 1927.

Present: RUGG, C.J., BRALEY, PIERCE, CARROLL, & WAIT, JJ.

*Practice, Civil,* Variance; Requests, rulings and instructions; Charge to jury; Exceptions. *Contract,* What constitutes, Construction, Modification. *Pleading, Civil,* Answer. *Evidence,* Materiality.

In the declaration in an action of contract by two plaintiffs against two defendants, the plaintiffs alleged in substance that, being in possession of valuable information as to an opportunity to purchase certain real

estate at an advantageous price, they saw the defendants, gave them the information "and the parties agreed that the plaintiffs would not attempt to purchase said property and thereby assist the defendants in the purchase; that the defendants would take a conveyance of said property, pay for same and thereafter the property would be carried by the defendants and sold and that after it was sold the net profits would be divided one third to the plaintiffs and two thirds to the defendants"; that the plaintiffs forbore to attempt to purchase, the defendants purchased and later sold at a profit and then refused to pay the plaintiffs anything. The answer included merely a general denial and an allegation of payment. *Held,* that

(1) Proof at the trial that the defendants also promised to share the profits of a resale in consideration of the plaintiffs' promise to them to use their best efforts to bring about a sale of the property was not a radical variance between the allegation and proof which went to the merits of the case and required that a verdict be directed for the defendants;

(2) Evidence at the trial that at a conference, after the giving to the defendants of the information referred to above, the plaintiffs suggested that the defendants finance the proposition in its entirety, that the defendants replied that they would interview the owner "and said, 'You fellows lay off, . . . and don't go near anybody, and don't make any attempts to buy this thing, and we will see just what we can do towards buying it at the lowest possible figure,'" to which the plaintiffs agreed, warranted a finding of both an offer and of an acceptance which resulted in the making of a contract;

(3) Such contract, if found, being oral and the facts in dispute, the language used and the meaning to be given to it were questions of fact for the jury;

(4) A conversation, occurring five days after that above described, at which the plaintiffs and defendants made it definite that the shares in the profits were to be divided on the basis of two thirds to the defendants and one third to the plaintiffs, properly might have been found to have been not a new contract nor a modification of the old contract as to profits, but in the nature of an interpretation by the parties of what would be a reasonable division of the profits;

(5) An exception to a refusal by the judge to grant a request by the defendants for a ruling that there was no partnership between the parties must be overruled, where it appeared that the judge in his charge gave instructions which defined to the jury as the relation between the parties a relation which was that of a joint undertaking, although he miscalled that relation a partnership, it further appearing that the defendants did not direct his attention to any possible confusion in his definition nor allege an exception to the charge.

A defendant is not entitled to have a trial judge read to the jury a summarization of the plaintiff's claim as the defendant assumed it to be and to instruct the jury as to the law applicable to that view of the testimony.

At the trial above described, the defendants were not entitled to have granted requests for rulings which were based upon an assumption of

misrepresentations of fact which may have induced the defendants to associate themselves with the plaintiffs, such defence not having been set up in their answer.

At the trial above described, it was within the discretion of the trial judge to refuse to permit one of the plaintiffs to be asked in cross-examination, in substance, whether he had any money at the time of the treaty with the defendants other than what he was "getting through a spendthrift trust," and to refuse to permit a trustee to answer questions in cross-examination with regard to the amount of a trust fund in which one of the plaintiffs was interested and the amount of advances made by the trustee to such plaintiff.

CONTRACT with a declaration described in the opinion. Writ dated January 11, 1924.

In the Superior Court, the action was tried before *Raymond*, J. Material evidence is stated in the opinion. The defendants asked that the following instructions, among others, be given to the jury:

"1. Upon the pleadings and the evidence the plaintiffs are not entitled to a verdict in this action.

"2. The plaintiffs are not entitled to recover in this action upon their declaration, as amended."

"4. Upon all the evidence there was no partnership between the plaintiffs and the defendants in connection with the purchase or sale of the property in question."

"7. If you find that no agreement was made between the plaintiffs and the defendants in regard to sharing profits in the events of a resale until after the defendants had entered into a binding agreement for the purchase of the property from the then owner, the plaintiffs are not entitled to recover."

"9. In order to entitle the plaintiffs to recover in this action it is necessary for them to satisfy you by a fair preponderance of the evidence that before the defendants entered into a binding, written agreement with the owner of the property to purchase the same, the defendants made an agreement with the plaintiffs that if the plaintiffs would not compete with them for the purchase of said property they, the defendants, would purchase the same and give the plaintiffs one third of the profits to be derived from a resale of the property."

"11. If you find that some time prior to August 15 the plaintiff had sought the assistance of the defendants in securing a mortgage upon the property in question and at that time had given them information and figures concerning the mortgage on the property, the interest thereon, rental and taxes; that on or about August 15 the plaintiffs suggested to the defendants that the defendants finance the proposition in its entirety and that both the plaintiffs and the defendants should all proceed to endeavor to sell the property after the defendants had had it in their control and all share in the profits arising in a resale; that the defendants replied that inasmuch as they knew the owner of the property they felt they could do better by dealing with him direct rather than through the agency of a real estate broker from whom the plaintiffs had received their information; that the defendants suggested that they would have some talk with the owner regarding the purchase of the property, and said that the plaintiffs should 'lay off' and not go near anybody and not make any attempts to buy the property themselves and the defendants would see just what they could do toward buying at the lowest figure; that subsequently the defendants entered into a binding, written agreement to purchase the property; and that after the execution of the written agreement the plaintiffs and the defendants had another conversation in which it was agreed that if the property could be resold at a profit the defendants would given the plaintiffs one third of the profits; and that the plaintiffs were in no way instrumental in selling the property thereafter at a profit, the agreement on the part of the defendants was unilateral and without consideration, and the plaintiffs are not entitled to recover in this action.

"12. If you find that thereafter the defendants secured the legal title to the property, and agreed to give the plaintiffs at least $7,500 as their share of the profits if the property were sold within three or four months at a certain price; and that the plaintiffs assented to said agreement, the plaintiffs are not entitled to recover upon their declaration in this action."

"14. If you find that the plaintiffs had voluntarily given

the defendants valuable information in regard to the price at which the property in question could be purchased and other matters pertaining thereto, and that subsequently the defendants entered into a binding, written agreement with the owner of said property to purchase the same; and that thereafter the parties agreed that if the plaintiffs could sell the property for the defendants at a price which would show a reasonable profit within thirty days the defendants would give the plaintiffs one third of the profits; and that after the expiration of said thirty days the parties agreed that if the plaintiffs were successful in procuring a purchaser for the property at a stated price the defendants would pay them a special commission of $7,500, but the defendants should take steps to sell the property to any other broker who might be able to procure a purchaser; and that shortly thereafter the defendants sold the property through another broker without any assistance from the plaintiffs, the plaintiffs are not entitled to recover in this action."

"16. Unless you find that before the defendants entered into a binding, written agreement for the purchase of the property in question they agreed with the plaintiffs that they would give the plaintiffs one third of the profits in consideration of the plaintiffs not attempting to purchase the property, the plaintiffs are not entitled to recover in this action."

The requests were refused. There was a verdict for the plaintiffs in the sum of $8,002.80. The defendants alleged exceptions.

*G. S. Ryan,* for the defendants.

*J. E. Hannigan,* for the plaintiffs.

PIERCE, J. This is an action of contract. The first count of the declaration was waived at the trial. The second count, "allowed by consent at the time of the trial," alleged in substance that on or about August 15, 1923, the plaintiffs "were in possession of valuable information to the effect that a certain parcel of property known as the 'Tech Block' could be purchased at an advantageous price and resold at a profit, and the plaintiffs were making efforts to purchase said property and were intending to purchase the same; that the

plaintiffs gave said information to the defendants and the parties agreed that the plaintiffs would not attempt to purchase said property and thereby assist the defendants in the purchase; that the defendants would take a conveyance of said property, pay for same and thereafter the property would be carried by the defendants and sold and that after it was sold the net profits would be divided one third to the plaintiffs and two thirds to the defendants; that in accordance with said agreement the plaintiffs forebore to attempt to purchase said property, the defendants purchased the same for a specified sum; that said property was later sold for a much larger sum, leaving a large profit, and thereupon the defendants refused to pay the plaintiffs any part of said profits or otherwise to keep their agreement." The answer was a general denial and payment.

At the close of the evidence and before final arguments the defendants filed a written motion that the court direct the jury to return a verdict for the defendants. This motion was denied, and the defendants duly excepted. The defendants at the close of the evidence and before final arguments presented certain written requests for instructions to the jury. The judge declined to give said instructions except so far as they were covered by his charge, and the defendants duly excepted. No exceptions were taken by either party to the charge. All the material evidence and all of the judge's charge are stated in the defendants' bill of exceptions. The case was submitted to the jury and it returned a verdict for the plaintiffs in the sum of $8,002.80.

The material facts in support of the plaintiffs' case which the jury were warranted in finding upon consideration of the whole testimony, giving credit to such portions of it as they deemed worthy of credence, are as follows: In the summer of 1923 the plaintiff Bowler learned from the office of Cape, Inc., real estate brokers in Boston, that the Tech Block in Cambridge could be purchased from its owner for about $200,000. There was an outstanding mortgage of $150,000 on the property, and Bowler decided that, if he could arrange a second mortgage for $40,000, he would furnish the remaining $10,000 himself out of funds that were available for his

benefit and purchase the block with the intention of reselling it at a profit; and to that end he invited the plaintiff Beatty to assist him in obtaining $40,000 upon a second mortgage in case he should purchase the property.

About the first of August, 1923, the plaintiffs went to the office of the defendants, who were practising lawyers in Boston, in an endeavor to raise the second mortgage, but were not successful. They gave the defendants a statement of the rents or receipts from the property and the amount of the mortgage, interest and tax assessment on it.

About the middle of August they again went to the office of the defendants and the plaintiff Bowler told them that he believed the property could be bought for less than $200,-000, and suggested that the defendants finance the proposition in its entirety and that the plaintiffs assist in selling the property and share in whatever profits might accrue from the resale. The defendants replied that they would interview Mr. Apsey, the record owner of the property, regarding its sale, "and said, 'You fellows lay off, . . . and don't go near anybody, and don't make any attempts to buy this thing, and we will see just what we can do towards buying it at the lowest possible figure,'" to which the plaintiffs agreed.

About August 20, the defendant Ammidon informed the plaintiffs that he had signed an agreement with Mr. Apsey to purchase the property for $191,000, plus $3,000 for some new flooring. On this occasion the minimum price at which the property should be resold was discussed and the parties agreed to use their best efforts to effect such resale. Bowler testified "that the question at that time arose as to how the profits should be divided; that . . . [the defendant] Bicknell made the remark, 'and when the property is sold how are the profits to be divided?'; that it was a question, put to the witness and Beatty; that Mr. Beatty replied, 'On an equal basis; fifty-fifty'; 'to which Mr. Bicknell replied saying that as long as they were going to put in all of the money that they would be unwilling to divide on that basis, and they then suggested that we take one third and they take two thirds of any profits arising from the sale of the

property'; that Beatty turned to the plaintiff and said, 'Is that agreeable to you?' and the witness replied, 'Yes.'"

Between the time the above conversation occurred and September 29 when the defendants actually took title, the plaintiff Bowler made efforts to effect a resale of the property and had reported his progress in this matter to the defendants.

Shortly after September 29, the plaintiffs met the defendants in their office and were informed by them that they had taken title; that the defendants were obliged to go to a great deal more expense than had been anticipated in taking the title; that the expense of financing was very large and that they did not know how much profit there might ultimately be in the transaction. Bowler replied that he thought it would be best for all parties concerned to discuss the exact amount of these expenses at that time rather than have any misunderstanding later on. The defendants then asked the plaintiffs what their share of the profits would be in the event that the property were sold for $225,000; the plaintiffs answered, "Substantially $10,000." The defendants then said that that would be entirely too much; that owing to the great expense of taking title they could not afford to pay that much. The parties then agreed upon $7,500 as the minimum in the event of a sale for $225,000. At this time the plaintiffs received no information as to the amount of the expenses other than that they were heavy.

About October 8, 1923, the plaintiffs again met the defendants in their office and were told by Bicknell that the defendants had sold the property, but he refused to tell the plaintiffs the amount received upon such sale. The plaintiff Bowler then said that in view of the fact they were all jointly interested in the profits arising from the sale it might be well for all parties to see the agreement. The defendants objected to this, saying that the plaintiffs, not having sold the property, nor put up any money, had no interest in those agreements; that no partnership relation existed between the parties and denied any right of the plaintiffs to a share in the profits. The property was actually sold by the defendants to one Hennessey for $230,000, less $150,000

existing mortgages, the net profit of the defendants being $21,064.05.

The consideration for the agreement of the defendants to share the profits of a resale of the aforesaid property with the plaintiffs inferentially is stated in the second count of the declaration to be "that the plaintiffs would not attempt to purchase said property and thereby assist the defendants in the purchase." This being so, proof that the defendants also promised to share the profits of a resale in consideration of the plaintiffs' promises to them to use their best efforts to bring about a sale of the property would not be a radical variance between the allegation and proof which went to the merits of the case and required a directed verdict.

The evidence of what took place at the interview on August 15, *supra*, if believed, would constitute both an offer and an acceptance. "Since the governing principle in the formation of contracts is the justifiable assumption by one party of a certain intention on the part of the other, the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Williston on Contracts, 2340. The force to be given to the conversation at this interview is determined by an answer to the question, What was the sense in which the plaintiffs should reasonably have apprehended the defendants would understand the proposal of the plaintiffs? *Stoddard* v. *Ham*, 129 Mass. 383, 385.

The alleged contract of August 15 was oral, the facts were in dispute: the language used and the meaning to be given it were questions of fact for the jury. *Hammond Coal Co. Inc.* v. *Lewis*, 248 Mass. 499, 501. The jury could have found a promise on the part of the defendants to try to buy the property at a favorable price if the plaintiffs would "lay off," did not "go near anybody," and did not "make any attempts to buy this thing"; and an acceptance by the plaintiffs when they "agreed to have nothing further to do with the negotiations for the purchase of the property, leaving the matter entirely" in the hands of the defendants. *Trowbridge* v. *Wetherbee*, 11 Allen, 361. The conversation of

August 20, at which the plaintiffs and defendants made it definite that the shares in the profits were to be divided on the basis of two thirds to the defendants and one third to the plaintiffs, was not a new contract nor a modification of the old contract as to profits, but was in the nature of an interpretation by the parties of what would be a reasonable division of the profits. On all the evidence it is plain the motion for a directed verdict for the defendants was refused rightly. Requests numbered 1 and 2 are embraced in the consideration given to the motion for a directed verdict.

Request numbered 12 is based upon the theory that the evidence disclosed a new contract, if the testimony of the plaintiffs were believed, whereby the plaintiffs surrendered all claims which they then asserted against the defendants, and acquired thereby a right to receive, in place of one third of the profits, the sum of $7,500 upon the resale of the property by them within three or four months as a special commission. In this regard the judge instructed the jury that there could be no recovery because the plaintiffs did not "sell the property so as to earn the commission. . . . I do not think there is any contention between these parties on that phase of the case at all."

Request numbered 4 reads as follows: "Upon all the evidence there was no partnership between the plaintiffs and the defendants in connection with the purchase or sale of the property in question." It is plain there was no partnership within the accepted legal definition of that term, for the reason that while the plaintiffs and defendants may properly have been found on the evidence to have a common interest, as adventurers in the enterprise, the plaintiffs' only interest was in the profits from a resale of the property, and they incurred no obligation to share in any possible losses. *Rosenblum* v. *Springfield Produce Brokerage Co.* 243 Mass. 111, 119. St. 1922 c. 486, §§ 6–8. If this were all, the exceptions should be sustained; but the judge, while he said "There must be a contract of partnership" and that "this case . . . turns wholly on the question of whether there was a partnership relation existing between Bowler and Beatty and Ammidon and Bicknell, and the plaintiffs' claim, based

wholly on that, is that he is entitled to a verdict on that basis, and . . . he is not entitled to a verdict on any other basis, . . . that is the vital point in this case," defined without exception a partnership to be a business status where "two or more people decide to put their money or goods or skill or labor into a common project for their mutual profit and advantage . . . there is something like a common endeavor that is called for in a partnership, an endeavor that reaches toward profit to be shared by the parties mutually, as a joint undertaking, and also perhaps there is a corollary to that same, an agreement either express or implied that any loss that is entailed shall likewise in common be shared by them, because all partnerships do not reach profits, very often they reach losses, and so it involves not only a sharing and participation in profits but also in losses." It is plain the defendants knew that a partnership involved as an essential term of its being an obligation of the members to share losses; and that they must have known that the jury under the charge would understand a partnership to be the thing that the judge described, without the corollary referring to a possible agreement, express or implied, to participate in any losses. In a word, the relation defined to the jury as possible was that of a joint undertaking miscalled a partnership. The defendants should have directed the attention of the judge to any possible confusion in his definition of a joint undertaking or of a partnership. Since they did not except to the charge, their exception to the refusal to give request numbered 4 should not be sustained.

Upon the case submitted to the jury, the defendants suffered no harm by the refusal of the judge to give requests numbered 7, 9, or 16. And they were not entitled to have the judge read to the jury the summarization of the plaintiffs' claim as the defendants assumed it to be, and to instruct the jury as to the law applicable to that view of the testimony. This summary omits any reference to inferences which a jury have the right to draw, and therefore may be incomplete or even untrue in substantial particulars. It follows that the requests numbered 11 and 14 were refused rightly. *Shattuck* v. *Eldredge,* 173 Mass. 165, 168.

*Morrissey* v. *Connecticut Valley Street Railway*, 233 Mass. 554, 556.

Requests numbered 18 and 19 were based upon the assumption of misrepresentations of fact which may have induced the defendants to associate themselves with the plaintiffs. Since the defence of fraud was not pleaded, the requests were refused rightly.

There was no error in the refusal on cross-examination to permit the defendants to ask Bowler, in substance, whether he had any money at the time of the treaty with the defendants other than what he was "getting through a spendthrift trust." Nor, on cross-examination of the trustee, Richard W. Hale, was it error to refuse to allow the witness to answer the question, "The amount of that trust fund is what?" or the question, "At any time in the past five years or — yes, the past five years, Mr. Hale, have you advanced any sum to Mr. Bowler like $25,000 for a real estate operation?" The amount of the trust was not material. It was not shown that the trust fund was not sufficient to enable the trustee to advance the amount stated. Both questions were properly excluded in the discretion of the court.

*Exceptions overruled.*