WILLIAM L. BANAGHAN vs. FRANCIS HENSHAW DEWEY,
JUNIOR, & others, trustees
(and three companion cases[1]).

Worcester.   September 22, 1959. — December 11, 1959.

Present: WILKINS, C.J., RONAN, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Landlord and Tenant*, Elevator, Landlord's liability to tenant or one
having his rights.  *Negligence*, Elevator, Res ipsa loquitur, Independent
contractor, Contributory.

The owner of an office building in control of the passenger elevator therein
might be held liable, for negligent failure to maintain the elevator in
good condition, to a tenant in the building injured in a fall of the
elevator due to a defective condition thereof where, even if the defects
existed at the time of the letting to the tenant, they were hidden in the
mechanism of the elevator and it then appeared to be in good con-
dition.  [77–78]
Apart from the common law duty of the owner of an office building to his
tenants respecting a passenger elevator under his control, the owner
might be found liable to a tenant whose contract of letting bound the
owner "to maintain the . . . elevator in a safe condition" and who
was injured in a fall of the elevator due to negligent failure so to
maintain it.  [78]
The plaintiff in an action for personal injuries sustained in a fall of an
elevator in a building might rely on the doctrine of res ipsa loquitur
even though there was evidence, which the jury might not have be-
lieved, showing specific negligence of the defendant causing the ac-
cident.  [78–79]
That the owner of an office building bound to his tenants to maintain the
passenger elevator therein in proper condition exercised care in select-
ing a reputable independent contractor to attend to the maintenance
would not relieve the owner of liability, for negligent failure of the inde-
pendent contractor to keep the elevator in proper condition, to a
tenant injured in a fall of the elevator due to its defective condition. [79]
An elevator company bound by a contract with the owner of an office
building to keep the passenger elevator therein in proper condition
would be liable, for negligent failure to perform that obligation, to a
tenant of the building and the operator of the elevator for injuries sus-
tained in a fall thereof due to its defective condition.  [80]

[1] The companion cases are by Conrad W. Peterson, William L. Banaghan,
and Joseph DiLiberto against the Bay State Elevator Company.

Evidence warranted a finding that a fall of a passenger elevator in a building was due to negligence of an elevator company having a duty to maintain it in proper condition in that an interlock system designed to immobilize the elevator in certain circumstances had been disconnected and did not immobilize the elevator as otherwise it would have when a contact box which was part of the interlock system and had become loose fell off, and in that when such contact box fell into the pit, became lodged in the machinery there and severed the cables of the elevator, causing it to fall, the governor of the elevator designed to stop it by applying a safety clamp to its rails in the event of excessive speed failed to operate by reason of an accumulation of hardened grease and dirt in its mechanism. [80]

It could not properly have been ruled as matter of law that an operator of an elevator in a building was guilty of contributory negligence in continuing to operate it despite the fact that unusual noises were heard and the elevator "labored" just before it fell and he was injured because a foreign object had become lodged in the machinery in the pit and finally severed the cables. [81]

FOUR ACTIONS OF TORT. Writs in the Superior Court dated September 22, 1949, November 7, 1949, December 31, 1953, and December 21, 1953.

At the trial before *Broadhurst*, J., there were verdicts for the plaintiffs.

*Berge C. Tashjian*, (*Richard G. Crotty* with him,) for the defendants Dewey and others, trustees.

*John M. Hart*, for the plaintiff Banaghan.

*Richard W. Mirick*, (*Sumner W. Elton* with him,) for the defendant Bay State Elevator Company.

*James C. Donnelly, Jr.*, for the plaintiff Peterson.

*Thomas S. Carey*, for the plaintiff DiLiberto.

RONAN, J. These are three separate actions of tort brought by the plaintiffs against the Bay State Elevator Company and another action by Banaghan against the owners of the building to recover damages sustained when a passenger elevator in which they were riding fell to the bottom of the pit. These actions were tried with one brought by DiLiberto against the owners which has since been settled, leaving for our consideration four remaining cases. They are here upon exceptions of the defendants to the denial of their motions to direct verdicts in their favor, to the denial of certain requests, and to portions of the charge.

The building, the Central Exchange Building on Main Street, Worcester, consisted of five stories. The first floor was occupied by two banks; the upper floors, by offices. Shortly before noon on the morning of February 7, 1949, the plaintiffs Banaghan and DiLiberto, tenants in the building, entered the elevator on the ground floor. It was being operated by the plaintiff Peterson, a licensed elevator operator. As it began to ascend, the passengers heard what they variously described as "a clanging sound," "a metallic sound, a grinding noise similar to the dragging of chains." The elevator cab "labored" until it reached the third floor where Peterson stopped it to permit Banaghan to leave, but before Peterson could open the door, the cab "bounced" up and down, and plunged thirty feet into the pit below.

The elevator was equipped with two safety devices: a system of interlocks (also known as contact boxes), and a governor. The interlocks were electrical devices contained in metal boxes secured by screws to the door at each landing. Their function was to immobilize the elevator whenever a landing door was open. The governor was a device, within and at the top of the elevator shaft, the function of which was to bring the cab to a gradual, safe stop by triggering a safety clamp to the elevator rails in the event the cab attained a speed of 350 to 375 feet per minute.

On the day after the accident one of the contact boxes was found lying in the pit. The cables had been broken. On investigation it was found that the system of interlocks had been rendered inoperative sometime prior to the accident by disconnecting and taping its wiring. The governor too was found not to have been functioning. Its mechanism was "frozen" from an accumulation of hardened grease and dirt of the consistency of sealing wax or dried varnish. A test made with a tachometer (an instrument for recording speed in revolutions per minute) revealed that the governor could not be spun fast enough to trip the safety clamp. It was spun up to 600 feet per minute and did not operate.

There was expert opinion evidence that the accident hap-

pened because one of the contact boxes became unfastened and fell into the pit, lodging in the mechanism and severing the cables. Had the interlock system been operating, the cab would have been immobilized when the contact box fell and the accident could not have happened. Nor could it have occurred had the governor been in working order. Compression of the buffer springs of the cab caused by the impact indicated that in its descent the elevator had attained a speed sufficient to trip the governor had it been functioning.

The elevator had been installed in the building in 1912 and, since 1923, had been serviced by the defendant Bay State Elevator Company. In 1926 Bay State installed new operating machinery — brake, motor, drum, car switch and cables — and in 1929 installed the governor. About 1925, 1926, or 1927 the elevator was subject to frequent interruptions in service as a result of its doors failing to close properly, thus immobilizing the cab as the result of the operation of the interlock system. The interlock system was disconnected "probably around 1927." The jury could have found that this was done by Bay State at the request of the then owners of the building.

There was evidence that Bay State had a continuing agreement with the trustees of the building to maintain, repair and inspect the elevator, except that major repairs — those costing $200 to $300 or more — required prior authorization by the trustees. There was also evidence that Bay State had orally agreed with the owners to maintain the elevator in "A-1 safe condition." Over a period of years it had installed parts, replaced cables, repaired the control board, brakes and door latches, and kept the elevator lubricated. It rendered monthly statements to the trustees for "oiling and inspection." There was evidence from which the jury could infer that the elevator company had not cleaned the governor for more than ten years prior to the accident; that the congealed grease and accumulated dirt in the governor were readily observable upon inspection; that this condition had existed for at least six months prior to the accident; that Bay State was aware of the faulty condition

of the interlocks; that the interlock which fell into the pit had been loose for some time prior to the accident; and that this defect too was discoverable upon proper inspection.

The trustees became owners of the building in 1943. There was evidence from which it could be inferred that certain of them knew prior to the accident that the interlocks were inoperative. The trustees had agreed with their tenants to keep the elevator in a safe condition. Their prior authorization was needed for major repairs, and very minor ones such as replacing burned out fuses were made by their servant Peterson, the operator. There was also evidence that on several occasions in the two to three months preceding the accident on February 7, 1949, the elevator was out of order, that in December, 1948, the cab began to vibrate noticeably in use, and that the vibration and bounces became progressively worse up to the time of the accident.

We first deal with the case of the tenant Banaghan against the trustees.

It is well settled that a landlord need only use reasonable care to keep his common passageways in as good a condition as they were or appeared to be at the time of the letting. *Story* v. *Lyon Realty Corp.* 308 Mass. 66, 69. *Lee* v. *Jerome Realty, Inc.* 338 Mass. 150, 152. The presiding judge charged the jury in part that Banaghan could recover if deterioration were shown, and the jury could believe from the evidence that the elevator had been out of order on various occasions during the month or so previous to the accident, that its condition was deteriorating, and that the worsening condition finally culminated in its collapse at the time of the accident. The tenant may rely upon the appearance of safety when he enters into the lease. *Draper* v. *Cotting*, 231 Mass. 51, 60. The rule with respect to common passageways, often applied in cases involving defective elevator gates, *Mikkanen* v. *Safety Fund Natl. Bank*, 222 Mass. 150, 153, *Story* v. *Lyon Realty Corp.* 308 Mass. 66, 70–71, *Brown* v. *A. W. Perry Co.* 325 Mass. 479, *McAvey* v. *Albany Realty Co.* 328 Mass. 310, 314, *Furber* v. *Rodney*, 331 Mass. 16, *Lee* v. *Jerome Realty, Inc.* 338 Mass. 150,

see *Jones* v. *Wood*, 330 Mass. 502, 505, or other defects in an elevator apparatus which are readily observable, *Freeman* v. *Hunnewell*, 163 Mass. 210, *Cushing* v. *Jolles*, 292 Mass. 72, 76–77, does not, however, apply to hidden defects within the mechanism of the elevator not readily observable by the tenant. *Cleary* v. *Cavanaugh*, 219 Mass. 281. *Ogden* v. *Aspinwall*, 220 Mass. 100. *Draper* v. *Cotting*, 231 Mass. 51, 58. See *Andrews* v. *Williamson*, 193 Mass. 92; *Chelefou* v. *Springfield Inst. for Sav.* 297 Mass. 236, 239. Here the faulty governor and disconnected interlocks were defects not apparent to the tenants, and the fact, if it was a fact, that they were in the same inoperative condition at the time of the letting as they were when the accident occurred does not relieve the trustees of liability. Furthermore, there was evidence that the trustees had assumed a duty greater than that imposed under the common law rule. O'Brien, one of the trustee owners, testified that "it was part of the owners' agreement with their tenants to maintain the front passenger elevator in a safe condition." Such an agreement, albeit unusual, see *Jacovides* v. *Chaletzky*, 332 Mass. 225, 226, may supplant the common law obligation. *Miles* v. *Janvrin*, 196 Mass. 431, *S. C.* 200 Mass. 514, 516. *Flanagan* v. *Welch*, 220 Mass. 186, 189–190. *Fiorntino* v. *Mason*, 233 Mass. 451, 453. *Eisenhauer* v. *Ceppi*, 238 Mass. 458, 460. *Boudreau* v. *Johnson*, 241 Mass. 12. *Cummings* v. *Copley*, 244 Mass. 448, 450. *Peirce* v. *Hunnewell*, 285 Mass. 287. *Trainor* v. *Keane*, 304 Mass. 466, 467. *Bailey* v. *First Realty Co.* 305 Mass. 306, 308. *Levins* v. *Theopold*, 326 Mass. 511. The charge in its entirety was indeed more favorable to the trustees than it need have been.

The trustees took exception to an instruction that the jury might infer negligence under the doctrine of res ipsa loquitur, so called. Negligence has been inferred from the mere occurrence of an elevator accident in cases very similar to the instant one. *Cleary* v. *Cavanaugh*, 219 Mass. 281. *Cushing* v. *Jolles*, 292 Mass. 72. The trustees urge that the doctrine has no application where every fact is in evidence. While this is undoubtedly a correct principle of law, and one

which has been applied where the cause is precisely known, *Gibson* v. *International Trust Co.* 177 Mass. 100 (passenger pulled stool from under elevator operator), here the jury were not required to accept the opinion evidence as to cause. As was said in *Cleary* v. *Cavanaugh*, 219 Mass. 281, 283: "[T]he plaintiff had a right to rely on the doctrine of res ipsa loquitur if the jury thought that he was unsuccessful in making out the case of specific negligence which he undertook to make out." In *Hill* v. *Iver Johnson Sporting Goods Co.* 188 Mass. 75, relied upon by the trustees, the doctrine is neither discussed nor considered. In the present case no question of control is raised, see *Cussen* v. *Weeks*, 232 Mass. 563, 565; *Tibbetts* v. *Wentworth*, 248 Mass. 468, 471; *Peirce* v. *Hunnewell*, 285 Mass. 287, 290, as it was stipulated in the pre-trial order that the defendant trustees were in control of the elevator at the time of the accident.

The trustees sought a ruling that they were not liable if they exercised care in selecting a reputable independent contractor to maintain the elevator. The short answer to this contention is that the jury could find that the trustees themselves were under an admitted duty to keep the elevator in a safe condition, and are liable even for the negligence of an independent contractor carefully selected by them. *Robbins* v. *Atkins*, 168 Mass. 45. *Levesque* v. *Hildreth & Rogers Co.* 276 Mass. 429, 434, and cases cited. Restatement: Torts, § 425, illustration 1; see also §§ 419–421. Negligently maintained, the elevator becomes inherently dangerous. Compare *Ferguson* v. *Ashkenazy*, 307 Mass. 197, 200, and cases cited. The trustees urge that liability should not attach where the maintenance involves work of so technical a character as to be "beyond the capability of . . . [a] person, lacking specialized mechanical or engineering training, to supervise or inspect competently." Compare Restatement: Torts, § 412, caveat. We need not pass upon this contention in the abstract as here it does not appear that care was beyond the trustees' capability. Most or all of the defects were either known to them or discoverable upon inquiry.

We turn to the three cases against the defendant elevator company.

Its obligation is measured by the terms of its contract with the trustees, and if thereby it was under a duty to maintain the elevator in a safe condition or to inspect it for defects, it is liable to third persons not parties to the contract who are foreseeably exposed to danger and injured as a result of its negligent failure to carry out that obligation. *Westinghouse Elec. Elevator Co.* v. *Hatcher*, 133 F. 2d 109 (5th Cir.). *Dahms* v. *General Elevator Co.* 214 Cal. 733. *Higgins* v. *Otis Elevator Co.* 69 Ga. App. 584. *Kahner* v. *Otis Elevator Co.* 96 App. Div. (N. Y.) 169, affd. 183 N. Y. 512. *Jones* v. *Otis Elevator Co.* 234 N. C. 512, 515. *Durham* v. *Warner Elevator Mfg. Co.* 166 Ohio St. 31. Restatement: Torts, § 311, illustration 1. Annotations, 123 A. L. R. 1197, 1203–1204; 6 A. L. R. 2d 284, 288–292; 13 A. L. R. 2d 191, 245–246. See *Carter* v. *Yardley & Co. Ltd.* 319 Mass. 92, 96–98; *Kushner* v. *Dravo Corp.* 339 Mass. 273; *Bollin* v. *Elevator Const. & Repair Co. Inc.* 361 Pa. 7; *Sutton* v. *Otis Elevator Co.* 68 Utah, 85; *Sheridan* v. *Aetna Cas. & Sur. Co.* 3 Wash. 2d 423.

Here the jury could have found that the elevator company had contracted with the trustees, at least to inspect the elevator, and at most to maintain it in "A-1 safe condition." They need not have believed the testimony of the company's vice-president, one Judd, that the agreement was limited to greasing and oiling, and that its "inspection" was merely to see if the elevator needed lubrication. It was for the jury to determine, upon conflicting evidence, what the agreement was. *MacDonald* v. *Kavanaugh*, 259 Mass. 439. *Beatty* v. *Ammidon*, 260 Mass. 566, 574. *Atwood* v. *Boston*, 310 Mass. 70, 75. *Trafton* v. *Custeau*, 338 Mass. 305, 307–308. The apparatus had been installed, repaired, and maintained by the defendant over a period of years, and there was ample evidence, which we need not repeat, of its negligence in inspecting and maintaining the elevator. The plaintiffs, tenants in the building and the elevator operator, were unquestionably within the class of persons likely to be injured by its negligence.

With respect to Bay State's exception to the admission of testimony of conversations between O'Brien and an official of the company who was dead at the time of trial, that testimony was admissible, as the requirements of G. L. c. 233, § 65, were met.

In the Peterson case the defendant urges that the plaintiff elevator operator was contributorily negligent. The burden of showing this was upon the defendant, G. L. c. 231, § 85, and despite evidence from which it could be inferred that he was aware of the defective condition of the elevator, we cannot rule as a matter of law that he was negligent in continuing to operate it. See *Stewart* v. *Harvard College*, 12 Allen, 58; *Hayes* v. *Boston Fish Mkt. Corp.* 319 Mass. 556, 559, and cases cited; *Constantine* v. *Proven Pictures of Boston, Inc.* 338 Mass. 463, 464. Compare *Simoneau* v. *Rice & Hutchins*, 202 Mass. 82.

All exceptions of the defendants have been considered and we find no error.

*Exceptions overruled.*