NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11827

LYNN KACE, administratrix,[1] vs.  IVAN LIANG.

Suffolk.     April 6, 2015. - September 10, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.

Wrongful Death.  Negligence, Wrongful death, Medical
    malpractice, Expert opinion.  Medical Malpractice, Expert
    opinion.  Evidence, Expert opinion, Learned treatise,
    Hearsay, Redirect examination, Cumulative evidence, Cross-
    examination, Medical record.  Internet.  Witness, Expert,
    Redirect examination, Cross-examination.  Practice, Civil,
    Wrongful death, Hearsay.

Civil action commenced in the Superior Court Department on
October 23, 2008.

The case was tried before Elizabeth M. Fahey, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

Carol A. Kelly for the defendant.
Adam R. Satin (Robert M. Higgins with him) for the
plaintiff.
John J. Barter, for Professional Liability Foundation,
Ltd., amicus curiae, submitted a brief.

---

[1] Of the estate of Jeffrey Kace.

BOTSFORD, J.  In this wrongful death action based on a claim of medical malpractice, the defendant, Ivan Liang, appeals from a judgment against him.  His appeal raises two issues of particular relevance to the trial of medical malpractice cases: (1) whether the plaintiff, through her counsel, complied with the obligations imposed by Mass. R. Civ. P. 26 (b) (4) (A) (i), 365 Mass. 772 (1974), to disclose the substance of and grounds for the opinions of an expert witness; and (2) whether certain materials obtained from the Internet qualify as published treatises, periodicals, or the like within the meaning of the "learned treatise" exception to the hearsay rule adopted in Commonwealth v. Sneed, 413 Mass. 387, 395-396 (1992).  See Mass. G. Evid. § 803(18)(B) (2015).  On the issue of expert disclosure we conclude that the plaintiff met the basic disclosure requirements of rule 26 (b) (4) (A) (i), although the disclosure was not as clear or complete as it could have been and the expert witness's trial testimony was inappropriately used by the plaintiff's counsel.  With respect to the Internet materials, we conclude that the pages taken from two Internet Web sites and used during the plaintiff's examination of the defendant did not qualify under the learned treatise exception to the hearsay

rule.[2]  Despite the evidentiary errors at trial, however, we further conclude that reversal of the judgment is not required because in the circumstances of this case, the errors did not result in undue prejudice to the defendant.

Background.  We summarize the facts of the decedent's medical treatment and death, taken from the evidence at trial, and reserve additional facts for later discussion in connection with the issues raised on appeal.  On August 14, 2006, at approximately 10:56 A.M., twenty-three year old Jeffrey Kace (Jeffrey)[3] entered the emergency room at Caritas St. Elizabeth's Medical Center (hospital) in Boston.  A triage nurse noted that Jeffrey had chest congestion and discomfort, fever, cough, and pain in taking deep breaths.  The nurse recorded Jeffrey's heart rate as 115 beats per minute; a heart rate over one hundred indicates the condition of tachycardia.

The defendant, who was at the time an emergency medicine physician at the hospital, examined Jeffrey at approximately 11:15 A.M.[4]  According to the defendant's notes in the medical

---

[2] The defendant also challenges in this appeal a ruling by the trial judge relating to the scope of defense counsel's cross-examination of the plaintiff's expert witness.

[3] Because the plaintiff Lynn Kace, Jeffrey Kace's mother and the administrator of his estate, shares the same last name, we refer to Jeffrey Kace by his first name.

[4] The trial in this case took place in February, 2014, approximately seven and one-half years after Jeffrey's visit to

record, Jeffrey presented with a cough, fever, slight sore throat, malaise, pleuritic chest pain,[5] and the need to cough with deep inspiration.  The defendant's notes indicate, contrary to those of the triage nurse, that Jeffrey had a regular heart rate.  The defendant took Jeffrey's medical history, which included asking Jeffrey about his past medical issues and those of his family members,[6] and conducted a physical examination. The defendant then ordered a chest x-ray, which revealed no abnormalities and showed a normal silhouette of the heart; he did not order an electrocardiogram (EKG) or any blood tests. The defendant diagnosed Jeffrey with bronchitis and prescribed an antibiotic as well as Vicodin, a narcotic pain reliever.  He did not consider as a diagnosis myocarditis, which is a condition that typically begins as a respiratory infection and spreads to the heart, inflaming and infecting it.

According to the medical record, a nurse administered Tylenol to Jeffrey at 11:20 A.M.  The defendant testified that

_____

the hospital's emergency department in 2006.  The defendant did not have any recollection of treating Jeffrey; the information concerning his treatment is derived from the hospital's medical record relating to the visit.

[5] Pleuritic chest pain occurs where the lungs and heart rub against each other, causing painful deep breathing.

[6] The defendant inferred from the boxes he had checked off on the medical record that he asked Jeffrey about his medical history and that of his family members.

typically a nurse would give a patient Tylenol only after the physician had concluded an examination of the patient, indicating that at least according to the medical record, the defendant's examination of Jeffrey lasted for five minutes, from 11:15 to 11:20 A.M. The record also reflected that Jeffrey was discharged from the hospital at approximately 11:25 A.M., twenty-nine minutes after he was first seen by the triage nurse.

The next morning, Jeffrey was found dead in his bed in his apartment. An autopsy revealed that he died of cardiac dysrhythmia[7] stemming from viral myocarditis. Myocarditis, which can cause sudden death, is often secondary to bronchitis, and the autopsy determined that bronchitis was a contributing cause of Jeffrey's death.

Procedural background. In 2008, Lynn Kace commenced this wrongful death action as the administrator of Jeffrey's estate.[8] The complaint alleged, among other things, that the defendant's medical care and treatment of Jeffrey was negligent and grossly negligent, and that the defendant's substandard medical care caused Jeffrey's death.

---

[7] Cardiac dysrhythmia refers to an irregular heartbeat the result of which is that the heart stops beating.

[8] The original complaint also named Charles Kace, Sr., Jeffrey's father and Lynn Kace's husband, as a plaintiff in his capacity as administrator of the estate, but he died prior to trial, and the action proceeded with Lynn Kace as the sole plaintiff.

At the close of a jury trial that took place in late February, 2014, the jury found the defendant negligent in his medical treatment of Jeffrey, and that his negligence caused Jeffrey's death; the jury did not find the defendant to have been grossly negligent. They awarded wrongful death damages in the amount of $2,925,000 to Lynn Kace in her capacity as administrator of Jeffrey's estate, but did not award any damages for pain and suffering by Jeffrey. Thereafter, the defendant filed a motion for a new trial or remittitur, in which he raised, among other claims, the issues he raises in this appeal. After a hearing, the judge denied the motion in its entirety. The defendant appealed to the Appeals Court, and we transferred the case to this court on our own motion.

Discussion. 1. Undisclosed expert opinion. a. Background. The parties filed a pretrial memorandum in 2011, three years before trial, that included expert witness disclosures and in particular summarized the anticipated testimony of their identified expert witnesses. In the pretrial memorandum, the plaintiff indicated that she would call as an expert witness Dr. Alexander McMeeking, and then set out the "facts and opinions" to which he would testify, including, as part of the "facts," Jeffrey's constellation of symptoms (cough, chest pain, malaise, and fever), the details of when Jeffrey arrived at the hospital (10:56 A.M.), when the defendant

examined him (11:15 A.M.), when Jeffrey was administered Tylenol (11:20 A.M.), when he was discharged (11:25 A.M.), and that he died of cardiac dysrhythmia due to viral myocarditis. For "opinions," the memorandum stated that McMeeking would opine at trial that the standard of care in 2006 required a doctor in the defendant's position to:

> "recognize and appreciate that fever, chest pain, malaise, and tachycardia could be signs and symptoms of viral myocarditis;
>
> "order an [EKG] and cardiac enzyme testing to rule out viral myocarditis; and
>
> "immediately admit the patient for cardiology and infectious disease consultations and steroid treatments if the diagnosis was considered."

Accordingly, McMeeking was expected to offer opinion testimony at trial that the defendant's treatment of Jeffrey fell below the standard of care for the average qualified emergency medicine doctor when the defendant:

> "failed to recognize and appreciate fever, chest pain, malaise, and tachycardia as signs and symptoms of viral myocarditis;
>
> "failed to order an [EKG] and cardiac enzyme testing to rule out myocarditis; and
>
> "failed to immediately admit [Jeffrey] for cardiology and infectious disease consultations, steroid treatments, and monitoring."

At trial in 2014, prior to McMeeking's testimony, the plaintiff's counsel called the defendant as a witness, and inquired at some length on direct examination about whether a

five-minute evaluation of Jeffrey was appropriate, without any objection from defense counsel.  The defendant responded, in part, that five minutes was insufficient to take and conduct a proper medical history and examination of a patient with Jeffrey's symptoms.  McMeeking testified next.[9]  He opined that the defendant's treatment of Jeffrey fell below the standard of care of the average qualified emergency room doctor in 2006, a standard that required a doctor to recognize that pleuritic chest pain could be a sign of myocarditis and to administer an EKG to a patient presenting with pleuritic chest pain.  He noted that the standard of care also demanded that a doctor, upon a suspicion of myocarditis, order blood tests to confirm the diagnosis and then admit the patient to a hospital for monitoring and treatment, and that myocarditis can be successfully treated if timely diagnosed.  The plaintiff's counsel then asked the following:

> Q.:  "I'd like you to assume that [the defendant] saw [Jeffrey] at approximately 11:15, based upon the records, and had written an order for Tylenol and had completed his exam by 11:20, or possibly earlier.  Do you have an opinion to a reasonable degree of medical certainty, in a patient like [Jeffrey], whether it would ever be appropriate to do a history and physical exam . . . in five minutes or less[?]"

---

[9] The plaintiff's counsel interrupted his direct examination of the defendant to accommodate the schedule of the plaintiff's expert witness, Dr. Alexander McMeeking.  The defendant completed his testimony following McMeeking's testimony.

A.: "I do, sir."

Q.: "What is your opinion?"

A.: "[I]t's . . . impossible to do a . . . competent history and a physical in five minutes. It would take at least 20 minutes to get an appropriate history and examination from a patient like [Jeffrey]" (emphasis added).[10]

Defense counsel objected. Counsel complained that the plaintiff's pretrial disclosure had focused solely on the defendant's failure to order an EKG in light of Jeffrey's symptoms, and had not included an opinion that the defendant's examination of Jeffrey fell below the standard of care because it was too brief. The judge overruled the objection. Later, in his direct examination of McMeeking, plaintiff's counsel asked:

Q.: "Doctor, do you have an opinion, to a reasonable degree of medical certainty, whether the deviations from the standard of care that you've listed here today, including the length of the interaction between [Jeffrey] and [the defendant] and his failure to obtain an EKG, do you have an opinion as to whether those failures were a substantial contributing factor in causing [Jeffrey's] death?"

A.: "I do, sir."

Q.: "And what is your opinion?"

A.: "[M]ost definitely and unfortunately, these all contributed directly to [Jeffrey] dying." (Emphases added.)

---

[10] During redirect examination, McMeeking again testified that "[y]ou can never get an adequate history and physical exam in five minutes."

   b.  Analysis.  The defendant argues that McMeeking's opinion that the defendant's five-minute examination of Jeffrey was too brief and fell below the standard of care (exam duration opinion) was separate and distinct from McMeeking's disclosed opinions on the defendant's deviations from the applicable standard of care in the pretrial memorandum; that the plaintiff did not give any notice of this additional opinion before the trial began; and that the judge abused her discretion by permitting McMeeking to opine on the insufficiency of a five-minute medical evaluation.  The defendant was prejudiced, he claims, by the nondisclosure in that he was unprepared to counter the opinion either through discovery aimed at impeaching its foundation or by further development of the factual record concerning the actual duration of Jeffrey's examination.  The plaintiff counters that the pretrial memorandum did implicitly disclose that the duration of the defendant's examination of Jeffrey was a factor supporting McMeeking's disclosed opinion on the defendant's deviation from the standard of care; and, by including all the timing details in the "facts and opinions" to which McMeeking would testify, the exam duration issue was raised.

   Our rules of civil procedure require a party to respond to expert witness interrogatories by disclosing the identity of

each expected expert witness as well as "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Mass. R. Civ. P. 26 (b) (4) (A) (i). The rules also require supplementation of an expert interrogatory response if there are any changes or additions to it. Mass. R. Civ. P. 26 (e) (1) (B). The goal is obvious: to facilitate the fair exchange of information about critical witnesses and to prevent unfair surprise. See Resendes v. Boston Edison Co., 38 Mass. App. Ct. 344, 351 (1995). Cf. Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992), quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958) (Fed. R. Civ. P. 26 is "consonant with the federal court's desire to 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent'"); Licciardi v. TIG Ins. Group, 140 F.3d 357, 363 (1st Cir. 1998) (discussing Fed. R. Civ. P. 26). Preventing untimely disclosure of expert testimony is particularly important in a medical malpractice action because expert testimony is almost always required, and it is often the central feature of the case. See Palandjian v. Foster, 446 Mass. 100, 105-106 (2006). It is also true, however, that a judge has broad discretion to admit or exclude "expert testimony when the proponent has not given proper notice of . . . the subject matter of the expert's anticipated

testimony, either in his answers to interrogatories or in his supplementary responses."  Elias v. Suran, 35 Mass. App. Ct. 7, 10 (1993).  In the absence of "prejudicial error resulting from an abuse of discretion," we "will not disturb a judge's exercise of discretion" regarding expert witness disclosures (citation omitted).  See Wilson v. Honeywell, Inc., 409 Mass. 803, 809 (1991).

There is no question that the spirit and purpose of our discovery rules would have been better served by a direct disclosure of the exam duration opinion.  Ultimately, however, we disagree with the defendant that the exam duration opinion was qualitatively different from McMeeking's standard of care opinions disclosed in the pretrial memorandum.  We understand McMeeking's trial testimony about the duration of the defendant's examination of Jeffrey as a form of explanation for -- and therefore as linked to -- his disclosed opinion that the defendant deviated from the standard of care by failing to recognize that Jeffrey's chest pain, fever, tachycardia, and malaise could be symptoms of myocarditis, and by failing to order an EKG to rule out that possibility.  Fairly considered in its entirety, McMeeking's exam duration opinion did not assert that a five-minute evaluation was always insufficient, but that it was insufficient time for the defendant to conduct a proper physical examination and gather an appropriate medical history

in Jeffrey's case. Because a history and examination are necessary to understand the meaning and context of a patient's symptoms,[11] McMeeking's exam duration opinion expresses the point that the defendant's brief evaluation of Jeffrey was inadequate for the defendant to acquire the information necessary to recognize the significance of Jeffrey's particular symptoms and arrive at an appropriate diagnosis. As such, it is a development of McMeeking's disclosed opinion that the defendant deviated from the standard of care by failing to recognize that Jeffrey's symptoms indicated a possible diagnosis of myocarditis. See Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 63-64 (1st. Cir. 2011) (defense expert's pretrial disclosure stated opinion that stroke was contributing cause of death but did not say it was dominant cause; admission of expert's testimony at trial implying that stroke was, in fact, dominant cause of death was not error because testimony was linked to disclosed opinions that decedent suffered stroke and that decedent's excessive bleeding suggested she suffered from more than skull fracture).[12]

---

[11] The defendant indicated as much at trial, testifying that a physician is to identify possible diagnoses after taking the patient's medical history and conducting a physical exam.

[12] The defendant relies on Licciardi v. TIG Ins. Group, 140 F.3d 357 (1st Cir. 1998), which interpreted Fed. R. Civ. P. 26(e). In that case, the court found an abuse of discretion in a judge's decision to admit expert testimony that was not

Moreover, the pretrial memorandum specifically disclosed the facts supporting McMeeking's exam duration opinion and testimony, namely, that Jeffrey arrived at the hospital at 10:56 A.M., the defendant examined Jeffrey at 11:15 A.M.; the nurse administered Tylenol at 11:20 A.M.; and Jeffrey was discharged at 11:25 A.M. From this, the defendant was or should have been aware well before trial that the timing details surrounding the defendant's examination of Jeffrey were in play.[13] Contrast Hammell v. Shooshanian Eng'g Assocs., Inc., 73 Mass. App. Ct. 634, 636-638 & n.3 (2009) (expert opinion disclosed prior to

---

disclosed prior to trial. Id. at 359, 363. In Licciardi, a pretrial report concerning the defendant's expert doctor's medical examination of the plaintiff indicated the doctor's opinion that the plaintiff suffered a bruise as a result of an amusement park ride accident; the doctor then changed course at trial and opined that the accident did not cause the plaintiff's bruise. Id. at 360-361. In addition, the doctor testified at trial to "the engineering and physics of the ride" even though this testimony was not discussed in his medical report. Id. at 362. Accordingly, Licciardi is distinguishable from the facts before us because, unlike McMeeking, the expert in Licciardi testified contrary to his pretrial report and included in his testimony opinions that were wholly unrelated to his pretrial disclosure.

[13] The plaintiff argues that the defendant also was put on notice that the duration of his examination of Jeffrey was in issue by the series of questions plaintiff's counsel posed to him, before McMeeking testified, about the adequacy of the defendant's five-minute examination of Jeffrey, and the defendant's response that five minutes probably was not an adequate amount of time for a proper examination. The defendant did not object to these questions. However, there is some truth in the defendant's position that posing such questions to the defendant does not, in and of itself, disclose that the plaintiff's expert will opine that this amount of time for an examination is insufficient and below the standard of care.

trial faulted multiple defendants, but opinion at trial changed to fault only one of these defendants; court held that trial testimony was not timely disclosed).

That said, the plaintiff's failure to disclose explicitly McMeeking's exam duration opinion is troubling, particularly when considered in light of how the plaintiff's counsel used that opinion at trial.  Although McMeeking ultimately did tie his exam duration opinion to his disclosed opinion that the defendant failed to recognize Jeffrey's symptoms as indicative of myocarditis, the plaintiff's counsel worked assiduously to separate them into two independent failures by the defendant to meet the standard of care -- as counsel's opening statement,[14] closing argument,[15] and direct examination of the defendant

---

[14] The plaintiff's counsel stated in his opening, for example:

> "[I]n this case you'll hear a lot of medicine, but this case is going to be about how much time [the defendant] really spent with a gentleman who came to his emergency room with a significant condition.  It will be about how much time is appropriate to spend with somebody who comes in with chest pains and I expect you'll hear the evidence to be less than five minutes is certainly not an appropriate amount of time to do a complete evaluation."

[15] In his closing argument, the plaintiff's counsel stated: "I would submit to you, ladies and gentlemen, that when a young man comes into an emergency department, feeling lousy enough to go to an emergency department at 23 years old and he has chest pain, discomfort -- call it what you want -- the standard of care is spend a little bit more than five minutes."  He added

reflect.[16]  In the circumstances, it is difficult to interpret the plaintiff counsel's words as anything other than intentional encouragement for the jury to find the defendant liable simply for spending too little time in evaluating and treating Jeffrey.[17]  We recognize that the duration of the defendant's examination was plainly embedded in the facts of the case, and that independently of the plaintiff's expert McMeeking, the plaintiff's counsel was entitled to ask the defendant about the duration of his examination of Jeffrey, and to comment on the length of this examination in counsel's opening and closing. However, counsel was not entitled to convert McMeeking's comments into an expert opinion about a separate deviation from the standard of care.

---

that Jeffrey "was in that emergency room for half an hour" and left ten minutes "after [the defendant] first laid eyes on him and [Jeffrey] was seen by the doctor, whose job it is to care for him, for less than five minutes."  He then implored the jury to "consider five minutes or less" in their deliberation.

[16] Before calling McMeeking as a witness, the plaintiff's counsel began his direct examination of the defendant and, perhaps in anticipation of McMeeking's exam duration opinion testimony, asked the defendant repeatedly whether a five-minute evaluation of Jeffrey was adequate; the defendant conceded that such an evaluation was inappropriately brief.

[17] It appears that the jury did not follow the plaintiff's counsel down the decisional path he proposed.  In his closing, counsel argued that "not ordering an EKG on a patient with chest pain" is negligence, but that "[s]pending less than five minutes with that person, that's gross [negligence], because that's not even trying to do your job."  The jury, however, did not find the defendant grossly negligent.

Expert witnesses are both legally essential and factually key witnesses in a medical malpractice case. The plaintiff's counsel and his law firm specialize in this field. We expect counsel to litigate medical malpractice cases in good faith and with adherence to our disclosure principles under our procedural rules including, in particular, Mass. R. Civ. P. 26 (b) (4). The overarching obligation to conduct litigation with fairness and integrity demands no less. Cf. Polansky v. CNA Ins. Co., 852 F.2d 626, 632 (1st Cir. 1988) ("we remind counsel that we do not view favorably any attempt 'to play fast and loose' with our judicial system. . . . Too often a lawyer loses sight of his primary responsibility as an officer of the court. While he must provide 'zealous advocacy' for his client's cause, we encourage this only as a means of achieving the court's ultimate goal, which is finding the truth. Deceptions, misrepresentations, or falsities can only frustrate that goal and will not be tolerated within our judicial system" [quotations, citations, and footnote omitted]).

Counsel's conduct makes reversal of the judgment in this case a close question, and unnecessarily so: disclosure of the exam duration opinion was available.[18] In the end, however, we

---

[18] Given that the plaintiff's counsel raised the duration of the defendant's examination of Jeffrey as a theme in his opening statement, used it in his direct examination of the defendant, and returned to it in his closing argument, it is certainly

conclude that reversal is not required.  Although McMeeking's exam duration opinion should have been more clearly disclosed as the grounds of his ultimate opinion regarding the defendant's deviation from the standard of care, the exam duration opinion -- as testified to by McMeeking himself -- served as a permissible explanation for, and development of, the expert's disclosed opinion regarding the defendant's failure to meet the standard of care by not recognizing the significance of Jeffrey's symptoms.  To the extent the plaintiff's counsel improperly sought to characterize the exam duration opinion as an ultimate or independent opinion regarding the standard of care, as previously stated (see note 17, supra), we conclude that the jury did not accept his view.[19]  Accordingly, reversal on the ground of prejudicial nondisclosure of the expert's opinion is not called for.  See Wilson, 409 Mass. at 809; Resendes, 38 Mass. App. Ct. at 350.

---

reasonable to infer that counsel knew that the examination's duration was going to be a major thrust of his presentation of the case well before the trial began.  The appropriate approach would have been to disclose the exam duration opinion in a timely manner before trial.

[19] Moreover, as discussed previously, separate and apart from McMeeking and his expert opinion, the plaintiff's counsel was well within his rights to question the defendant about the duration of his examination of Jeffrey and to comment on that duration during counsel's opening statement and closing argument.  It also is the case that the defendant's counsel did not object to the plaintiff counsel's opening, closing, or examination of the defendant.

2.  <u>Learned treatises</u>.  a.  <u>Background</u>.  During his redirect examination of the defendant, plaintiff's counsel showed the defendant and questioned him about two printouts of Internet Web site pages, both titled "Myocarditis" and both listing what the pages described as common symptoms of myocarditis, from the Web sites of Johns Hopkins University School of Medicine (Johns Hopkins) and Mayo Clinic, respectively.  The defendant testified that he was familiar with the two medical institutions, but not with the content of their Web sites concerning myocarditis.[20]  After the defendant reviewed these Web site pages (Web pages), plaintiff's counsel asked him to read the text of each.  The defendant complied, which amounted to him testifying that Johns Hopkins's Web site referenced fatigue, shortness of breath, rapid heartbeat, fever, chest pain, and congestive heart failure as symptoms of myocarditis, and that Mayo Clinic's Web site listed as common symptoms chest pain, rapid heartbeat, shortness of breath, fluid retention, fatigue, aches, and fever.  The defendant then confirmed that Jeffrey exhibited certain of these symptoms when the defendant examined him.  The Web pages themselves were marked for identification but not admitted in evidence.  Defense

---

[20] No other expert witness testified to the reliability of these two Web site pages, and the judge did not take judicial notice that they were reliable authorities.

counsel objected to this entire line of questioning; the judge overruled the objection.

b. <u>Analysis</u>. The defendant argues that the use by the plaintiff's counsel of these Web pages to cross-examine him was impermissible under this court's prior decisions as well as Mass. G. Evid. § 803(18)(B), because (1) the defendant was not testifying as an expert witness, and (2) in any event, the printed Web pages should have been excluded as unauthenticated and unreliable because they were undated and without a named author. We agree with the defendant.[21]

Section 803(18)(B) sets out the general learned treatise exception to the hearsay rule. It allows a party on cross-examination of an expert witness to bring the expert's attention to, question the expert about, and read in evidence "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by

---

[21] We only consider here Mass. G. Evid. § 803(18)(B), and do not consider G. L. c. 233, § 79C, or Mass. G. Evid. § 803(18)(A), both of which permit admission of qualifying treatises and periodicals in medical malpractice actions so long as a party gives notice of the intent to offer such evidence at least thirty days prior to trial. The facts of this case make clear that the plaintiff could not avail herself of § 79C (or Mass. G. Evid. § 803[18][A]) because she did not give sufficient notice of her intent to use the printouts in question.

judicial notice."[22]  We adopted this section in Sneed, 413 Mass. at 396.[23]  In doing so, we described the procedure applicable to using a learned treatise on cross-examination of an expert witness at trial as follows:

> "Proposed rule 803(18) [Mass. G. Evid. § 803(18)(B)] requires that an opponent of the expert witness bring to the witness's attention a specific statement in a treatise that has been established, to the judge's satisfaction, as a reliable authority.  The witness should be given a fair opportunity to assess the statement in context and to comment on it, either during cross-examination or on redirect examination. The judge, of course, will have to determine the relevance and materiality of the statement and should consider carefully any claimed unfairness or confusion that admission of the statement may create."

Id.

---

[22] Section 803(18) of the Massachusetts Guide to Evidence (2015) pertains to the use of learned treatises.  Section 803(18)(B), titled "Use in Cross-Examination of Experts," provides as follows:

> "To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence, but may not be received as exhibits."

[23] Commonwealth v. Sneed, 413 Mass. 387 (1992), predated the Massachusetts Guide to Evidence.  The court in Sneed considered Proposed Mass. R. Evid. 803(18), which had been proposed by the court's Advisory Committee to Study the Rules of Evidence (July, 1980).  See Sneed, supra at 395 & n.6.  The text of Proposed Mass. R. Evid. 803(18) is identical to the text of Mass. G. Evid. § 803(18)(B).

We consider first the defendant's argument that neither of the Internet Web pages qualified as a "reliable authority" that could be used in cross-examining an expert witness under § 803(18)(B) and Sneed, 413 Mass. at 396. The standard for establishing the reliability of a statement varies depending on the context in which the statement is published. With regard to a "treatise," we have held that "the rule contemplates that an authored treatise, and not the statements contained therein," must be established as reliable. Brusard v. O'Toole, 429 Mass. 597, 602-603 (1999). As to a periodical or journal, however, "[i]n these days of quantified research, and pressure to publish, an article does not reach the dignity of a 'reliable authority' merely because some editor, even a most reputable one, sees fit to circulate it." Id. at 603-604, quoting Meschino v. North Am. Drager, Inc., 841 F.2d 429, 434 (1st Cir. 1988). Accordingly, a statement within "an article in a journal or periodical would be admissible under [§ 803(18)(B)] if an opponent of the expert witness establishes that the author of the . . . article is 'a reliable authority.'" Brusard, supra at 604 n.8.

Along the continuum from treatises to journals, it is readily apparent that the Johns Hopkins and Mayo Clinic Web pages are very different from a treatise and resemble far more closely articles in a journal or a periodical. Cf. Jasper v.

Tomaiolo, 20 Mass. App. Ct. 201, 204 (1985) (learned treatises "are subjected to careful professional criticism"). Cf. also Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965, 976 n.19 (C.D. Cal. 2010), and cases discussed (Internet encyclopedia "Wikipedia" is not learned treatise). The content of the Web pages indicates that they are not medical "treatises" of any sort intended to be read and used by physicians, but rather are directed at laypersons: both Web pages list symptoms of myocarditis and direct the reader to call a doctor if he or she develops them. See Fed. R. Evid. 803, Advisory Committee Note to Paragraph 18 (1972) (commenting on analogous Federal rule of evidence on learned treatises; noting treatises are "written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake"). And significantly, the Web pages list no author or authors.[24]

To establish the admissibility of the statements taken from the Johns Hopkins and Mayo Clinic Web sites, the plaintiff's counsel was obligated to show that the author or authors of the Web pages was or were "a reliable authority." See Brusard, 429

---

[24] The Mayo Clinic "myocarditis" Web page indicates that it was written by "Mayo Clinic Staff" but does not name a specific author or further identify or describe the "staff" in question.

Mass. at 603, 604 n.8.[25]  The credibility of Johns Hopkins and Mayo Clinic as highly respected medical institutions or facilities is not enough to demonstrate the reliability of statements on individual pages of each institution's Web site. There is nothing to say who wrote each Web page, or whether the author of each Web page was an appropriate source of information regarding the common symptoms of myocarditis.  This is not to say that materials published on the Internet may never qualify as "learned treatises" as the term is used in § 803(18)(B).[26] The point, rather, is that the reliability of the material that a party intends to use pursuant to § 803(18)(B) must be established -- which means establishing that the contents of the specific article, Web page, or other material was authored or

---

[25] The defendant does not challenge here the authenticity of the Web pages at issue, that is, whether these Web pages were actually copied from the official Internet Web sites of Johns Hopkins University School of Medicine and Mayo Clinic.  We envision, however, that there are likely to be cases in which a dispute arises about whether a particular Web page is what it purports to be.  See generally Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534, 541-562 (D. Md. 2007); United States v. Jackson, 208 F.3d 633, 638 (7th Cir.), cert. denied, 531 U.S. 973 (2000); Frieden, The Admissibility of Electronic Evidence Under the Federal Rules of Evidence, 17 Rich. J.L. & Tech. 1, 22-23 (2011).  We leave consideration of such issues for another day.

[26] See Williams v. Long, 585 F. Supp. 2d 679, 691 (D. Md. 2008) (concluding that in "an age where so much information is calculated, stored and displayed on a computer, massive amounts of evidence would be inadmissible" if all information on Internet is considered "inherently unreliable" [quotations and citation omitted]).

prepared by a "reliable authority" pursuant to one of the means spelled out in § 803(18)(B).  See Mass. G. Evid. 803(18)(B) (treatise, periodical, etc., may be established as reliable authority by testimony or admission of testifying witness, other expert testimony, or judicial notice).

In the present case, given that the Web pages in question did not reference a particular author or authors, it was not possible for the plaintiff's counsel to establish their reliability as required by the evidence rule.  See Evans v. Toledo Neurological Assocs., 20 N.E.3d 333, 343 (Ohio Ct. App. 2014) ("foundation could not be laid for establishing" Internet article as "authoritative and reliable" under analogous learned treatise exception to hearsay rule because "author and original publication date of the article could not be ascertained").  See also Bullock v. Lott, 964 So. 2d 1119, 1133-1135 (Miss. 2007) (judge erred in permitting counsel to use article printed from Internet to cross-examine expert witnesses where article was not established as reliable by these witnesses or other experts, and judge did not take judicial notice of article's reliability).

The defendant contends that independent of the question whether the Johns Hopkins and Mayo Clinic Internet Web pages qualified as "learned treatises" under § 803(18)(B), that section did not permit plaintiff's counsel to use the Web pages in his redirect examination of the defendant.  The defendant is

correct.  Sneed and its progeny make clear that § 803(18)(B) shields a treatise from exclusion as hearsay only where the treatise is brought to the attention of an expert witness on cross-examination.  See Sneed, 413 Mass. at 395 (noting that this court's Advisory Committee, in proposing rule 803(18), "commented that the rule was limited to statements called to the attention of an expert witness on cross-examination"; noting further "potential benefit, and little risk of harm" in allowing "a party challenging an expert's opinion to interrogate that expert" about learned treatise).  See also Brusard, 429 Mass. at 602; W.G. Young, J.R. Pollets, & C. Poreda, Evidence § 803.18 (2d ed. 1998) (learned treatises "are admissible to challenge an expert's opinion and to question that expert regarding a relevant, divergent opinion on cross examination").  Here, however, the plaintiff's counsel referenced and used the Web sites of Johns Hopkins and Mayo Clinic in his redirect examination of the defendant, who, although a licensed physician and experienced in the field of emergency medicine, was not testifying as an expert witness at this trial; he was a party to the case, and was testifying solely in his capacity as such.[27] The defendant was asked and answered questions by both counsel

---

[27] Neither party listed the defendant as an expert witness in their joint pretrial memorandum; in fact, the plaintiff listed the defendant as an expected witness, but explicitly did not categorize him as an "expert witness."

that called for his opinion regarding the propriety of his own medical treatment of Jeffrey.  His testimony, however, did not include an opinion on the appropriate standard of care in 2006, and did not turn him into an expert witness within the meaning of § 803(18)(B).[28]  As a result, § 803(18)(B) did not apply to plaintiff's counsel's examination of the defendant, and in particular did not authorize counsel to use the Web pages during that examination in the manner he did.  Therefore, evidence concerning the content of these Web pages, introduced for its truth, constituted inadmissible hearsay; the defendant's objection should have been sustained for this reason as well. See Commonwealth v. Reese, 438 Mass. 519, 526-527 (2003).

We turn to the question of prejudice.  The Web pages presented to the jury evidence that Jeffrey had certain symptoms of myocarditis when the defendant examined him.  It was evidence that may have been enhanced in significance by the reputation of the two renowned institutions of medicine, and enhanced even

---

[28] The plaintiff's reliance on the Superior Court judge's opinion in Long vs. Roy, 10 Mass. L. Rep. 140 (1999), is misplaced.  The issue in that case was whether a plaintiff in a medical malpractice action, in deposing the defendant doctor before trial, was entitled to ask questions about the defendant doctor's opinion concerning the medical treatment the doctor had provided.  Id. at 141-142.  A deposition is not trial, and a defendant doctor's status as a kind of "expert" to whom opinion questions may be posed concerning the treatment the doctor provided the plaintiff in a deposition does not answer whether that same doctor is to be treated as an expert witness at trial for the purposes of § 803(18)(B).

more by the plaintiff's counsel mischaracterizing the Web pages as "studies" in his closing. However, in light of other evidence properly admitted in this case, we cannot conclude that the defendant was materially prejudiced. The symptoms of myocarditis read from each Web page were cumulative: the defendant and his own expert witness, Dr. John Benanti, both testified, independently of the Web pages, that substantially all of these symptoms are associated with myocarditis. Reversal on account of the judge's error relating to the Web pages is not warranted. See Doyle v. Dong, 412 Mass. 682, 688 (1992).

3. Use of Jeffrey's prior medical record on cross-examination of the plaintiff's expert. Finally, the defendant argues that the trial judge abused her discretion and committed error in precluding his counsel from using one of Jeffrey's prior medical records in his cross-examination of McMeeking, the plaintiff's sole expert witness. We agree.

The relevant background to the claim is the following. Included in the agreed-upon trial exhibits were (1) pages of Jeffrey's medical records from the health center at the university that Jeffrey had attended, dated October, 2003, and May, 2004; and (2) a page from a pediatric medical record of Jeffrey's that was dated September, 2000. In his direct examination of McMeeking, the plaintiff's counsel asked the witness about these earlier medical records, beginning with

those dated 2003 and 2004. In particular, counsel asked whether the records reflected that Jeffrey had been treated for bronchitis in 2003 and 2004, and whether they indicated any complaint of chest pain at that time.[29] Counsel then asked about the 2000 medical record, and simply inquired whether that record mentioned bronchitis (it did).[30] The 2000 medical record, fairly read, included a complaint of pain when coughing that one might reasonably infer to mean chest pain,[31] but it contained no indication that an EKG was performed. When defense counsel sought to question McMeeking on cross-examination about the 2000 medical record, plaintiff's counsel objected, stating that one word of it was illegible. The judge sustained the objection, asserting that it would not be fair to question McMeeking about the record because it did not explicitly reference chest pain, and that she had previously heard counsel "on the standard of care issue."

---

[29] The 2003 and 2004 medical records did reflect that Jeffrey received treatment for bronchitis but do not contain any reference to complaint of chest pain.

[30] The unspoken but obvious point of the questions were to contrast Jeffrey's prior history of bronchitis with the history he reported when he came to the hospital's emergency department in 2006, and to suggest that the defendant should have explored Jeffrey's prior experiences with bronchitis and the differences between those experiences and his present complaint.

[31] The record indicates that Jeffrey had "pain with deep" inspiration.

The ruling was error.  Where the medical record was in evidence by agreement and the plaintiff's counsel had specifically used it in his direct examination of the witness, defense counsel should have been permitted to ask questions about the same record in his cross-examination of the same witness.  See Commonwealth v. Cataldo, 326 Mass. 373, 377 (1950) ("cross-examination on the same subject as the direct examination" is appropriate).  Similarly, the judge erred in refusing to allow defense counsel to mention Jeffrey's 2000 medical record, a trial exhibit, in his closing argument as part of his discussion of McMeeking.  We are not persuaded, however, that reversal is required on account of these two errors.  This is so because the record itself was very brief and contained a minimal amount of information, there was no evidence concerning the prior medical episode of bronchitis referenced in the record, and no evidence concerning whether an EKG even could have been administered at that time and in that setting.  See Adoption of Sherry, 435 Mass. 331, 336-337 (2001) (error in excluding evidence was not prejudicial where such evidence would not have affected central issue in case).

Judgment affirmed.