**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 12, 2019**

# In the Court of Appeals of Georgia

A18A1810. MOORE v. WELLSTAR HEALTH SYSTEM, INC. et al.

BARNES, Presiding Judge.

This case arises from the medical treatment and death of 41-year-old James Moore, who aspirated while being placed under anesthesia for surgery, and died a few days later. His surviving spouse and the administrator of his estate, Tanya Moore (hereinafter "Moore"), sued multiple physicians and entities, advancing claims of medical malpractice. After a jury trial, judgment was entered on a defense verdict. Moore's subsequent motion for new trial was denied. In this appeal, Moore maintains that she is entitled to a new trial because the trial court erred by allowing in evidence certain inadmissible and prejudicial hearsay. For reasons explained below, we agree and reverse.

On the morning of December 23, 2011, Moore's husband drove himself to Wellstar Paulding Hospital's emergency room seeking treatment for severe abdominal pain and nausea. At about 8:30 a.m., a computerized tomography ("CT") scan of his abdomen was taken, and a radiologist discerned a bowel pattern consistent with small bowel obstruction, early or partial. An emergency- medicine doctor reported the case to the on-call general surgeon, who admitted Moore's husband as a hospital patient with the diagnosis of small bowel obstruction, and ordered that he have "nothing by mouth."

Moore's husband was seen at about 5:30 p.m. by the surgeon, who diagnosed him with gastroenteritis (as opposed to a small bowel obstruction); thereafter, he was upgraded from "nothing by mouth" to "clear liquid." But Moore's husband continued to suffer from severe abdominal pain, as well as nausea and intermittent vomiting.

On December 25, 2011, at about 9:00 a. m., another CT scan of Moore's husband's abdomen was taken. A different radiologist discerned findings compatible with high-grade[1] small bowel obstruction and found that his abdomen was "massively distended." The radiologist uploaded his findings – including his opinion that

---

[1] The radiologist testified that "high-grade" meant that "very little bowel contents [were] moving past the obstruction."

Moore's husband would benefit from a nasogastric ("NG") tube – to the hospital's computer, so as to make his findings available to the surgeon. The surgeon was notified that the CT results were available; he "look[ed] at the CT scan [him]self" and discerned "objective evidence" of bowel obstruction. Close to noon on that same day, the surgeon discussed the case with the radiologist; and the surgeon concluded that Moore's husband required immediate surgery.

An NG tube removes contents from the stomach, helping to prevent aspiration of stomach contents into the lungs. Generally, once a patient is administered anesthesia medication, his protective gag reflex is impaired, which can allow stomach contents (including gastric fluid,[2] which can be extremely toxic to the lungs ) to flow up the esophagus, then down into the lungs.

An anesthesiologist was called in for Moore's husband's anticipated surgery; the anesthesiologist and the surgeon discussed the case, and agreed not to place an NG tube prior to administering the anesthesia medication. They determined that the

_____

[2] The surgeon described at trial that gastric fluid is primarily hydrochloric acid, and also contains bile, bacteria, food particles, and mucus secreted from the epithelial cells.

proper course of action would be to place an NG tube after the induction of anesthesia using a process called rapid sequence induction.[3]

But as the anesthesiologist was performing the rapid sequence induction, Moore's husband vomited, aspirating gastric fluid into his lungs. The anesthesiologist suctioned Moore's husband's lungs, then placed an NG tube, and surgery proceeded to correct the bowel obstruction. After the surgery, the anesthesiologist had trouble keeping up Moore's husband's oxygen levels. Having suffered lung failure, from which he never recovered, Moore's husband died on January 5, 2012.

In 2013, Moore filed this action against: (i) the surgeon, Dr. Vanchad Memark; (ii) Wellstar Health System, Inc., Dr. Memark's employer; (iii) the anesthesiologist, Dr. Christopher Stowell; and (iv) the latter's employer, Georgia Anesthesiologists, P.C. (Collectively, the defendants will be referenced as the "Medical Defendants."[4]) The alleged negligence was the failure to place an NG tube prior to the induction of anesthesia.

---

[3] That process involves pre-filling the patient's lungs with oxygen gas, followed by applying cricoid pressure, administering rapid-onset sedative or hypnotic drugs, and then placing an endotracheal tube to protect a patient's airway. The NG tube would then be placed, with the actual surgery following.

[4] While an additional entity was initially named in the complaint, the Medical Defendants were the only defendants at the underlying trial.

At the 2016 trial, all parties presented expert evidence regarding the standard of care as to when an NG tube should be placed. According to Moore's evidence, the CT scan conducted on December 25 left no doubt that Moore's husband had a high-grade small bowel obstruction; the standard of care thus required placement of an NG tube *before* the induction of anesthesia; and failure to do so was the cause of death. In contrast, according to the Medical Defendants' evidence, there was no requirement to place an NG tube prior to the induction of anesthesia; and the course of action employed here – placement of an NG tube *after* the induction of anesthesia using a process called rapid sequence induction – did not breach the applicable standard of care.

Over a two-day period, the jury deliberated in the aggregate for nearly 12 hours. The trial court summoned the jury back into the courtroom; in response to two questions submitted by the jury,[5] the court gave instructions that tracked Georgia's

---

[5] The two questions were: What happens if we remain undecided on one defendant? Can we deliver a verdict on one defendant and then we continue deliberation on the other?

5

pattern modified "Allen" charge.[6] Later that day, the jury returned its verdict finding in favor of each of the Medical Defendants.

In her single claim of error on appeal, Moore contends that the trial court erred by admitting hearsay evidence. In particular, Moore complains that the defense presented evidence taken from a document by the American Society of Anesthesiologists (ASA) – "Committee on Expert Witness Testimony Review and Findings Regarding Expert Witness Testimony of Ronald L. Katz" (hereinafter, the "Katz Committee Findings"). Such evidence showed that in 2011, the ASA sanctioned an anesthesiologist – Dr. Ronald Katz (who had no involvement in the instant case) – for giving certain standard-of-care testimony (in a different case), and that the sanctioned testimony was similar to standard-of-care testimony given by Moore's expert-anesthesiologist in the instant case. On appeal, Moore contends that the ASA's findings in a wholly different case against an expert witness who had nothing to do with this case amounted to inadmissible, prejudicial hearsay.

The Medical Defendants counter that the evidence was admissible under the "learned treatise" hearsay exception found at OCGA § 24-8-803 (18). Further, they

---

[6] See Suggested Pattern Jury Instructions, Vol. I: Civil Cases § 02.700 (Verdict, Hung Jury). See generally *Drayton v. State*, 297 Ga. 743, 748 (2) (a) (778 SE2d 179) (2015).

6

argue that even if allowing the evidence was error, Moore waived the issue by failing to object properly. Additionally, they assert that, to the extent there was a valid objection to inadmissible hearsay, admission of the evidence was harmless.

We address the foregoing arguments by first setting out the cited Code provision, next detailing portions of the trial transcript most relevant to the admission of the contested evidence, then ascertaining the extent to which the parties' arguments have merit.

1. *Georgia's "learned treatise" exception to the hearsay bar.* Pursuant to OCGA § 24-8-803 (18),

> The following shall not be excluded by the hearsay rule, even though the declarant is available as a witness: . . . To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets, whether published electronically or in print, on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice. If admitted, the statements may be used for cross-examination of an expert witness and read into evidence but shall not be received as exhibits.[7]

---

[7] With respect to the issues presented here, OCGA § 24-8-803 (18) materially mirrors Federal Rule of Evidence (FRE) 803 (18). "Having found a Federal Rule of Evidence using materially identical language that addresses the evidentiary issue

2. *Presentment of the contested evidence.* The Katz Committee Findings was first mentioned during the cross-examination of one of Moore's expert witnesses, Dr. Bryan McAlary, a board certified anesthesiologist. He had opined on direct examination that Dr. Stowell (the defendant-anesthesiologist) had breached the standard of care by failing to place an NG tube before he "put the patient to sleep." Dr. McAlary had further explained on direct that placing an NG tube and removing gastric fluid prior to administering the anesthesia medication would have decreased the chances of aspiration.

During cross-examination, counsel for Dr. Stowell (the defendant-anesthesiologist) re-visited Dr. McAlary's position regarding the standard of care. In response to a question on that issue, Dr. McAlary testified that where it has been unequivocally determined that the patient has a bowel obstruction, the standard of care requires the placement of an NG tube before a surgery (unless the patient has refused such placement). Cross-examination continued:

covered by [OCGA § 24-8-803 (18)], the question of whether to apply state or federal precedent ends: we look to federal appellate precedent until a Georgia appellate court decides the issue under the new Code." *State v. Almanza*, 304 Ga. 553, 558 (2) (820 SE2d 1) (2018). In case of a conflict "among the decisions of the various circuit courts of appeals in interpreting the federal rules of evidence, the precedent of the Eleventh Circuit prevails." (Citation and punctuation omitted.) Id. at 559 (3).

Q: Okay. And as far as you're concerned this is not a matter of judgment by the anesthesiologist, it's basically a rule that must be followed unless the patient actually refuses to have the NG tube placed.

A: Yes.

Q: It's not a matter of judgment in your opinion.

A: No. Once it's been unequivocally determined and it represents an obvious risk, then it needs to be – that risk needs to be addressed.

Q: Are you familiar with the ASA case against the anesthesiologist Dr. Ronald Katz?

A: No. I have met Ron Katz. He's, from my perspective, a well-respected teacher, but I didn't know that there was any litigation.

Q: Do you agree or disagree with this statement: Placing a nasogastric tube in a patient with a full stomach is a judgment call. Anesthesiologists could reasonably differ on whether to place a nasogastric tube under the circumstances in this case.

A: I would have to know more about the case, but I think your phrasing was "a full stomach." Okay. No. That's what would make this case different from the case in front of this jury today – namely, we don't just have a full stomach, we have an obstructed bowel.

Q: Are you aware that that statement came from the American Society of Anesthesia in their opinion sanctioning Dr. Katz for exactly the opinions that you have given in this case?

A: No, and I would respect that what you read is not exactly the opinions I've given in this case.

Q: Okay.

A: Because I have certainly cared for full-stomach patients and have not place a nasogastric tube prior to induction. . . .

9

The second mention of the Katz Committee Findings was when counsel for Dr. Memark (the defendant-surgeon) cross-examined Dr. Stowell (the defendant-anesthesiologist). Defense counsel pursued cross-examination about ASA guidelines as to expert witness qualifications and testimony, then turned to ASA's application of those guidelines:

> Q: You're familiar with the ASA guidelines concerning expert witness qualifications and testimony. You know they publish those.
> A: Yes.
> Q: Those are generally available to the medical profession, correct?
> A: Yes, I – to be honest, I'm not familiar with them, but I assume that's true, yes.
> Q: Well, Dr. McAlary indicated – you heard him indicate those were things that were out there and available from the ASA.
> A: Yes.
> Q: And one of the things the ASA has said is that if you come in and say you must put – in any case that you don't have an anatomical reason not to use the NG tube, you must use an NG tube in a small bowel obstruction, anybody that says that is being unethical, correct?

Moore's counsel interjected a hearsay objection, which was followed by:

Defense counsel: No, Your Honor. I'm asking about an expert report. That is hearsay, but I'm entitled – or expert publication; I'm entitled to

do that. . . . Just like [plaintiff's counsel] had hearsay with the books that he was using.[8]

Plaintiff's counsel: No, sir. He's trying to cross-examine him on a dispute between two anesthesiologists testifying against each other in a litigated case. That would be hearsay.

The Court responded, "I'll allow the question." Hence, defense counsel focused on the Katz Committee Findings:

Q: Well, Doctor, let me show you – you've seen the "Committee on Expert Witness Testimony Review and Findings Regarding Expert Witness Testimony of Ronald L. Katz," haven't you?
A: Yes.
Q: This is a public publication from the American Society of Anesthesiologists, correct?
A: Yes.
Q: The reason they publish these is to allow physicians, treating physicians, to know and better understand what the standard of care the guidelines are, correct?
A: Yes.

---

[8] The trial transcript shows that Moore's counsel had, during a direct examination of an expert, referenced textbooks *Miller on Anesthesia*, *Harrison's on Internal Medicine*, *Schwatz's Principles of Surgery*, and *Sabiston Textbook of Surgery*. And in their joint brief to this Court, Dr. Memark and Wellstar acknowledge that "[one of Moore's experts had] used several medical textbooks to discuss the timing of the placement of an NG tube."

Q: And in this case, as to Dr. Katz, they found – do you agree or disagree they found we do not dispute that Dr. Katz strongly believes that a nasogastric tube should be placed in any patient with a presumed full stomach unless there's a contraindication, but we find this is a personal belief of Dr. Katz's that does not accurately reflect the standard of care? Do you agree with that?

A: I agree with that.

Defense counsel went on to elicit Dr. Stowell's testimony that Dr. Katz's disciplinary proceedings had stemmed from a case where, similar to the instant case, a patient had a small bowel obstruction and the physicians had elected not to place an NG tube before the induction of anesthesia; that under the circumstances of that case, "because an anesthesiologist can reasonably differ on whether to place the nasogastric tube . . . , Dr. Katz [had] improperly condemned [the] decision not to place the nasogastric tube"; that Dr. Katz's testimony had thus violated ASA guidelines on giving expert witness testimony; and that the ASA consequently sanctioned Dr. Katz.[9]

---

[9] Counsel for Dr. Memark and WellStar later announced to the court, "Your Honor, I'd like to mark the opinion as Defendant's Exhibit 1 and tender it." Moore's counsel objected: "It would be continuing evidence." Defense counsel responded, "[I]t's not continuing evidence. It's a direct committee statement, and I just tender it." The court sustained the objection. The transcript shows that the Katz Committee Findings (document) was then marked as an exhibit for identification, but no such exhibit appears in the appellate record.

3. *Whether the Katz Committee Findings fell within Georgia's "learned treatise" exception to the hearsay bar, OCGA § 24-8-803 (18).* As stated above, Moore contends that the trial court erred by admitting evidence regarding the Katz Committee Findings. She cites Dr. Memark's counsel's comparison of the Katz Committee Findings to "the books" that her counsel had used during a prior direct examination, but asserts that the comparison was incorrect. While evidence from the referenced textbooks was admitted pursuant to OCGA § 24-8-803 (18), Moore maintains that the Katz Committee Findings did not qualify as a "treatise, periodical, or pamphlet" as contemplated by that statutory provision.

There is no dispute that the Katz Committee Findings amounted to hearsay. The Medical Defendants maintain, however, that the Katz Committee Findings fell within the "learned treatise" hearsay exception. Collectively, they point out that Moore's own expert-anesthesiologist, Dr. McAlary, acknowledged ASA as a well-respected organization, estimated that 85 percent of the anesthesiologists in the United States were members, and stated that he himself had long been a member. Dr. McAlary further testified that he was aware that the ASA provided various guidelines (including the ones on expert witness qualifications and testimony), and that the ASA

13

spoke "with some authority" as to some medical issues, but had chosen not to address and speak upon other medical issues.

Even if we assume arguendo that the Katz Committee Findings document was "published" within the meaning of OCGA § 24-8-803 (18), we cannot thus conclude that the document automatically falls within the ambit of that statutory provision merely because its authoring organization is highly regarded. See generally *Costantino v. Herzog*, 203 F3d 164, 172 (2d Cir. 2000) ("[T]he contents of a periodical cannot be automatically qualified 'wholesale' under [FRE] 803(18) merely by showing that the periodical itself is highly regarded.").[10] On its face, OCGA § 24-8-803 (18) limits its scope to statements contained in published "treatises, periodicals, or pamphlets," which are established as a reliable authority. Application of even "a

---

[10] Accord *Kace v. Liang*, 36 NE3d 1215, 1226-1227 (2) (b) (Mass. 2015) ("The credibility of Johns Hopkins and Mayo Clinic as highly respected medical institutions or facilities is not enough to demonstrate the reliability of statements on individual pages of each institution's Web site.").

liberal interpretation of [OCGA § 24-8-803 (18)], favoring admissibility,"[11] cannot eviscerate that explicit requirement.[12]

Georgia's "learned treatise" exception does not expressly reference the type of document at issue here.[13] Furthermore, the Medical Defendants have cited no authority illustrating that the Katz Committee Findings nevertheless falls within the purview of that statutory provision; and we find none.

Nothing in *Constantino v. Herzog*, 203 F3d 164 (2d Cir 2000), cited by the Medical Defendants, provides for an outcome in their favor. Urging that the "learned

---

[11] *Allen v. Safeco Ins. Co.*, 782 F2d 1517, 1519-1520 (3) (11th Cir. 1986) (referencing Advisory Committee Notes pertaining to FRE 803 (18)), vacated in part on other grounds, 793 F.2d 1195 (1986). See generally *Almanza*, 304 Ga. at 553 (3), n.5 (espousing that Advisory Committee Notes are not binding precedent, but are "highly persuasive").

[12] See *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009) (reiterating that an appellate court "is not authorized to disregard any of the words used [in a statute] unless the failure to do so would lead to an absurdity manifestly not intended by the legislature," and further reciting that "[t]he express mention of one thing in an act or statute implies the exclusion of all other things") (citation, punctuation, and emphasis omitted).

[13] On appeal, Moore describes the Katz Committee Findings as "findings from a medical association's internal disciplinary hearing"; Dr. Stowell and Wellstar describe the document as "committee findings by a professional organization" and as a "treatise"; and Dr. Stowell and Georgia Anesthesiologists describe the document as "findings of a committee issued by the [ASA]." And before the trial court, when tendering the document, defense counsel referred to it as an "opinion."

15

treatise" exception has been given a more expansive scope, the Medical Defendants point out that *Constantino* concluded that FRE 803 (18) encompassed a videotape. But the circumstances attendant to the videotape were materially different from those relating to the Katz Committee Findings. The videotape was a training resource from the audiovisual library of the American College of Obstetricians and Gynecologists. Id. at 168. During its 15-minute presentation, the videotape narrated/illustrated procedures and maneuvers for physicians to employ when a delivery presented a particular medical complication. Id. at 168-169. Citing factors such as the "video's use as a training resource," its "clinical format," and its "calm and instructional tone," the *Constantino* Court held that the requirements of the FRE 803 (18) were satisfied. See id. at 171-173 (I) (A), (B) (ascertaining that videotapes may amount to "nothing more than a contemporary variant of a published treatise, periodical or pamphlet").

It is clear that the neutrality and the educational focus of the videotape were pivotal in the conclusion reached in *Constantino*. Accord *United States v. Martinez*, 588 F3d 301, 312 (A) (1) (6th Cir. 2009) ("Authors of treatises have no bias in any particular case[.]") (citation, punctuation, and emphasis omitted). In contrast, the Katz Committee Findings (document) was written by the ASA about its own disciplinary proceedings against a particular anesthesiologist for a violation of specific ASA

16

guidelines. The Medical Defendants posit that the Katz Committee Findings nevertheless serves to guide ASA members when called upon to give expert testimony. But even if so, as numerous jurisdictions have held, the logic for admitting hearsay materials under the "learned treatise" exception is *undermined* where an author has published the materials with a view toward litigation.[14] See generally, e. g., *O'Brien v. Angley*, 407 NE2d 490, 494 (Ohio 1980) (reasoning that "[w]here . . . the author publishes an article with a view toward litigation, or where he possesses a personal interest in a litigable matter, a probability of bias exists which undermines the logic supporting the admission of this material in evidence as an exception to the rule against hearsay"; and thus concluding that the admission of excerpts from an editorial published in Journal of the American Medical Association during cross-examination of plaintiff's expert was error because the editorial was not an "authoritative exposition of medical theory or principle" that might be characterized as "learned treatise," but was primarily an expression of opinion by physician

---

[14] See further footnote 27, infra.

concerning controversial subject which posed risk of litigation for his colleagues in

the medical profession).[15]

---

[15] Accord *People v. Behnke*, 353 NE2d 684, 688 (Ill. App. 1976) ("In examining the circumstances attending the publication of treatises which would be regarded as a sufficient indication of their reliability, it has been stressed that such document are generall*y* not written with a view to litigation or the interests of a litigable affair. . . .") (citation omitted); *Commonwealth v. Sneed*, 597 NE2d 1346, 1351(3) (Mass. 1992) (reasoning that a statement properly admitted under the "learned treatise" exception is one "whose authenticity and reliability are shown, which was not written for use in litigation, and which expresses an expert opinion on a subject relevant to the case on trial") (citations omitted); and see *Schneider v. Revici*, 817 F2d 987, 991 (II) (A) (2d Cir. 1987) (trial court properly rejected text as "learned treatise," where proponent failed to provide basis for court to view it as trustworthy); *United States v. Jones*, 712 F2d 115, 121 (III) (A) (5th Cir. 1983) (refusing to extend scope of FRE 803 (18) so as to allow an opposing party's expert to be cross-examined by the introduction of testimony that had been given at another trial, by a different expert, where the hearsay evidence lacked "the element of trustworthiness that is inherent in the learned treatise exception"). See generally *Riley v. State*, 2019 Ga. LEXIS 109, at *9 (3); 2019 WL 654176, at *3 (3) (Case No. S18A1048, decided February 18, 2019) (acknowledging that "sister jurisdictions" may be considered on questions presented on appeal); *Almanza*, 304 Ga. at 556-557 (2) (instructing Georgia's courts on applying federal precedent, when deciding issues pertaining to Georgia's new Evidence Code); *Community & Southern Bank v. Lovell*, 302 Ga. 375, 380 (3) (807 SE2d 444) (2017) (finding the decisions of the federal circuit courts persuasive).

Hence, for all the foregoing reasons, there was no basis to find that the Katz Committee Findings fell within the scope of OCGA § 24-8-803 (18), and admission of statements contained therein was error.[16]

4. *Waiver*. We cannot regard the error as waived. According to Dr. Memark and Wellstar, Moore was required to object when defense counsel referenced the Katz Committee Findings during the cross-examination of her expert-anesthesiologist, Dr. McAlary.[17] But as set out above, when Dr. McAlary was initially asked whether he

---

[16] This Court has held, "A trial court's decision to admit evidence as an exception to the hearsay rule will not be disturbed absent an abuse of discretion." (Citation and punctuation omitted.) *Goldsmith v. Peterson*, 307 Ga. App. 26, 31 (3) (703 SE2d 694) (2010). See *Chua v. Johnson*, 336 Ga. App. 298, 299 (784 SE2d 449) (2016) (describing that an abuse of discretion "occurs where the trial court's ruling is unsupported by any evidence of record or where that ruling misstates or misapplies the relevant law") (citation and punctuation omitted). Accord *Lamonica v. Safe Hurricane Shutters*, 711 F3d 1299, 1317 (II) (D) (11th Cir. 2013) (cautioning that while evidentiary rulings are generally reviewed for abuse of discretion, "things are not always so simple" – some evidentiary rulings may "require legal and factual determinations that call for different standards"; reaffirming that "questions of law underlying evidentiary rulings are reviewed de novo"; and noting principle that "[b]asing an evidentiary ruling on an erroneous view of the law constitutes an abuse of discretion per se"); *Costantino*, 203 F3d at 170 (I) (A) (reviewing de novo the district court's "legal conclusion that videos can constitute learned treatises") (emphasis omitted).

[17] OCGA § 24-8-802 ("[I]f a party does not properly object to hearsay, the objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible.").

19

was familiar with "the ASA case against the anesthesiologist Dr. Ronald Katz," he answered no. Dr. McAlary was next asked whether he agreed with a particular statement: "Placing a nasogastric tube in a patient with a full stomach is a judgment call. Anesthesiologists could reasonably differ on whether to place a nasogastric tube under the circumstances in this case." The statement was not then attributed to any particular source; and Dr. McAlary responded with: "I would have to know more about the case. . . ." Finally, Dr. McAlary was asked, "Are you aware that that statement came from the American Society of Anesthesia in their opinion sanctioning Dr. Katz for exactly the opinions that you have given in this case?" Dr. McAlary answered, "No, and I would respect that what you read is not exactly the opinion I've given in this case."[18] No additional questions were posed to Dr. McAlary as to the Katz matter. Fairly construed, the record does not demonstrate that the exchange between Dr. McAlary and defense counsel triggered a wholesale waiver to object to the Katz Committee Findings.[19]

---

[18] See generally *Collier v. State*, 282 Ga. App. 605, 607 (639 SE2d 405) (2006) ("What lawyers say is not evidence, including what they may suggest in cross-examination of a witness.").

[19] Notably, at the new trial hearing, counsel for Dr. Stowell and Georgia Anesthesiologists argued that "the foundations had begun to be laid with Dr. [McAlary]," and that defense counsel "continued to lay the foundation with [Dr.

And given the particular hearsay ground urged,[20] we find no merit in the Medical Defendants' contention that any error in allowing subsequent statements contained in the Katz Committee Findings was waived for failure to secure a continuing objection.[21]

5. *Harm.* Finally, we reject the Medical Defendants' position that the error was harmless as resulting in only cumulative evidence.[22]

As all parties acknowledge on appeal, the critical question of fact for the jury was whether Dr. Memark and/or Dr. Stowell breached the standard of care by not

---

Stowell]." Moreover, it is undisputed that the Medical Defendants did not identify the Katz Committee Findings during discovery.

[20] See generally *Sharpe v. Dept. of Transp.*, 270 Ga. 101, 102 (505 SE2d 473) (1998) ("It is the rule in Georgia that objections should be made with sufficient specificity for the trial court to identify the precise basis. It is not important in what format the allegation is cast so long as it is clear to the court the specific error alleged that the court may have the opportunity to correct them.").

[21] Georgia's new Evidence Code provides that "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection." See OCGA 24-1-103 (a) . The provisions of Georgia's new Evidence Code "apply to any motion made or hearing or trial commenced on or after" January 1, 2013. Ga. L. 2011, p. 99, § 101.

[22] See generally *Connelly v. State*, 295 Ga. App. 765, 768 (3) (673 SE2d 274) (2009) (reciting that "hearsay erroneously admitted is harmless error where other legally admissible evidence of the same fact is introduced at trial").

placing an NG tube prior to the induction of anesthesia.[23] To carry her burden of proof,[24] Moore relied in large part on the testimony of her expert-anesthesiologist, Dr. McAlary, who opined that the standard of care in this case required placement of an NG tube before the induction of anesthesia.

The Medical Defendants have shown that they presented admissible evidence that the defendant-physicians did not breach the standard of care. But the Katz Committee Findings was used to further show that Dr. McAlary's standard-of-care testimony was materially the same as that given by Dr. Katz, which resulted in Dr. Katz being sanctioned. The reasonable inference was that Dr. McAlary's testimony as to the standard-of-care was *sanctionable* by the ASA, and thus not worthy of belief in a court of law.[25] Because evidence of the Katz Committee Findings was

---

[23] See generally *Smith v. Finch*, 285 Ga. 709, 711 (1) (681 SE2d 147) (2009) (reciting that the "standard of care [for physicians] is that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally") (citation and punctuation omitted).

[24] See id. ("To establish professional medical negligence the evidence presented by the patient must show a violation of the degree of care and skill required of a physician.") (citation and punctuation omitted).

[25] Indeed, counsel for Dr. Memark and Wellstar told the jury during closing argument that the "ASA is just like you. They come down to facts." Defense counsel went on to remind the jury of the factual underpinnings of the Katz Committee Findings, then asserted that "Dr. Katz came in and said what Dr. McAlary said in this

22

inadmissible, because it was used to unfairly impeach Moore's expert witness as to the core issue of the standard of care,[26] and because the sanctioning of Dr. Katz by the ASA for violating ASA expert-witness guidelines was conflated with standard-of-care issues reserved for the jury,[27] we believe that admission of evidence from the Katz Committee Findings was prejudicial to the extent that Moore is entitled to a new trial.[28]

---

case; absolutely every time you must do it. And they said while he may believe that, we find this personal belief of Dr. Katz does not accurately reflect the standard of care." Similarly, counsel for Dr. Stowell and Georgia Anesthesiologists told the jury during closing argument that "Dr. Katz was sanctioned by the ASA for saying exactly the same thing that Dr. McAlary told you from the stand under oath the other day – that is, that oh, you must always place a tube in 100 percent of the cases and never put someone to sleep unless they have had an NG tube. It's just not true. How can you take the word of Bryan McAlary against [the defense expert witnesses]?"

[26] See generally *Renew v. Edenfield*, 200 Ga. App. 484, 485 (2) (408 SE2d 499) (1991) ("[T]here is no general rule of law which allows all hearsay evidence to be used for impeachment."), overruled on other grounds as explained in *Broomberg v. Hudgens*, 206 Ga. App. 797 (1) (426 SE2d 617) (1992).

[27] What is more, one of Dr. Stowell's expert witnesses testified, "[T]here are a lot of committees on the ASA. I don't think the expert witness committee sets up any standards of care at all. The expert witness committee sets up how experts should behave and what they should do."

[28] OCGA § 9-11-61 ("No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or

*Judgment reversed. Brown and Goss, JJ., concur.*



order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").